**William S. FLICKINGER, Plaintiff,**

**v.**

**HAROLD C. BROWN & CO., INC. and Bradford Broker Settlement, Inc. n/k/a Fidata Corporation, Defendants.**

**No. CIV–89–1218S.**

United States District Court,
W.D. New York.

March 28, 1991.

---

Brian P. Crosby and Martin J. Zuffranieri, Gibson, McAskill & Crosby, Buffalo, N.Y., for plaintiff William S. Flickinger.

Victor T. Fuzak, Hodgson, Russ Andrews & Goodyear, Buffalo, N.Y., for defendant Harold C. Brown & Co., Inc.

Louis J. Maione, Salon, Marrow & Dyckman, New York City, for defendant Bradford Broker Settlement, Inc.

## DECISION AND ORDER

SKRETNY, District Judge.

### Introduction

Plaintiff William S. Flickinger commenced this action against defendants Harold C. Brown & Co. ("Brown") and Bradford Broker Settlement, Inc., n/k/a Fidata Brokerage, Inc. ("FBI"), alleging against each defendant (1) violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5 (First and Fifth Causes of Action), (2) fraud in violation of state law (Second and Sixth Causes of Action), (3) breach of contract (Fifth and Seventh Causes of Action), and (4) breach of fiduciary duty (Fourth and Eighth Causes of Action).

Jurisdiction is predicated on 15 U.S.C. § 78aa and this Court's pendent jurisdiction.

A non-jury trial was held before me on January 3 and January 4, 1991. This matter is now before me for a final decision on the merits.

### Conclusion

For the reasons set forth below, judgment is rendered in favor of defendants on all plaintiff's claims.

### FINDINGS OF FACT

1) Defendant Brown is a registered securities broker and dealer engaged in the business of providing investment securities advice and services. This includes making arrangements for the purchase and sale of securities to clients. It maintains an office for the transaction of business in Buffalo, New York.

2) Plaintiff William S. Flickinger is an individual who has been a client of Brown for over 20 years.

3) No written agreement exists between plaintiff and Brown or FBI.

4) On or about December 1, 1982, Brown and defendant FBI entered into a "Fully Disclosed Clearing Agreement" ("Agreement") (Exhibit 17), pursuant to which FBI was to execute and clear securities transactions for Brown's clients.

5) In addition to clearing securities transactions, FBI in some cases would keep custody of funds and securities for Brown's clients. In this case, however, Brown had instructed FBI that plaintiff's account was "register and ship." Such designation required FBI to register the securities purchased on behalf of the client in the client's name and to ship the securi-

ties to the client at the client's designated address.

6) FBI also sent periodic statements (hereinafter, "activity statements") to Brown's clients at their designated addresses, which statements reflected, for a specified period of time, any activity that had taken place in the client's account for which FBI had performed clearing services. Copies of the activity statements sent by FBI to Brown's clients also were sent by FBI to Brown. Copies of activity statements for plaintiff's account with FBI for the periods of April 30, 1983 through May 27, 1983 (Exhibit 3), May 28, 1983 through June 24, 1983 (Exhibit 4), June 25, 1983 through August 26, 1983 (Exhibit 5), and August 27, 1983 through September 30, 1983 (Exhibit 6) were admitted into evidence at the trial.

7) Plaintiff at no time had any direct dealings with FBI, and was not aware that the Agreement between Brown and FBI existed.

8) In 1974, plaintiff executed an authorization (Exhibit 19) empowering Brown to carry out any instructions received from his brother, Thomas Flickinger ("Thomas"), regarding the buying, selling or delivering of any securities for plaintiff's account. This authorization was in effect throughout 1983, and during that time, Thomas managed plaintiff's securities portfolio, had complete control over plaintiff's account and acted as his agent in most of plaintiff's dealings with Brown. Plaintiff kept no records of his investments, other than recording the dividends he received for tax purposes.

9) On or about June 1, 1983, plaintiff or Thomas instructed Brown to purchase 1500 shares of common stock of Lubrizol Corporation, a registered security, for plaintiff's account.

10) On or about June 1, 1983, Brown instructed FBI to purchase 1500 shares of common stock of Lubrizol Corporation for plaintiff's account.

11) On or about June 1, 1983, FBI purchased 1500 shares of common stock of Lubrizol Corporation for plaintiff's account through a facility of the National Securities Exchange.

12) Exhibit 4, an activity statement for plaintiff's account with FBI, reflects FBI's June 1, 1983 purchase of the 1500 shares of Lubrizol Stock for plaintiff's account.

13) Plaintiff paid $34,125.00 for the 1500 shares of Lubrizol stock and $873.14 in commission.

14) As of August 26, 1983, the 1500 shares of Lubrizol stock were still listed as "BOUGHT RECEIVED OR LONG" (see Exhibit 5), indicating that FBI still had possession of the securities, or owed the securities to plaintiff.

15) Activity statements provided to Brown from FBI regarding plaintiff's account for the period of May 28, 1983 through August 26, 1983 confirmed that plaintiff owned 1500 shares of Lubrizol stock.

16) On or about September 13, 1983, Brown wired FBI to inform FBI that Brown's records indicated that the Lubrizol stock was still being held in safekeeping by FBI. This was in error because plaintiff's account was a "register and ship" account, and Brown therefore requested that FBI mail the securities to plaintiff.

17) Exhibit 6, an activity statement for plaintiff's account with FBI for the period of August 27, 1983 through September 30, 1983, reflects that the 1500 shares of Lubrizol stock were delivered to plaintiff on September 19, 1983. However, plaintiff never received any certificates evidencing the 1500 shares of Lubrizol stock.

18) Beginning in late September 1983, FBI was in the process of selling its clearing operations to the Pershing Division of Donaldson, Lufkin & Jenrette ("Pershing"). This involved transferring to Pershing any cash and securities positions that were long in FBI's accounts. FBI's transfer agent for this conversion was National City Bank in Cleveland, Ohio.

19) On October 24, 1983, FBI delivered to National City Bank Stock Certificate No. NB44416, representing 1500 shares of Lubrizol Corporation common stock, registered in the name of William S. Flicking-

er. This stock certificate subsequently was cancelled by means of a Bradford Broker Settlement, Inc. Irrevocable Stock or Bond Power, purportedly bearing plaintiff's signature, which signature was guaranteed by FBI. The shares of stock represented by the Certificate were subsequently registered in the name of Cede & Co. and deposited in FBI's account at The Depository Trust Company ("DTC"). Cede & Co. is a nominee name used by DTC. Plaintiff's account was not credited with the proceeds of this transfer. A copy of the cancelled stock certificate was admitted into evidence as Exhibit 11 and a copy of the executed and guaranteed stock power was admitted as Exhibit 11a.

20) From time to time plaintiff signed blank stock powers for use by Brown to transfer securities, but he never signed one in the form of Exhibit 11a.

21) The signature appearing on Exhibit 11a is not plaintiff's signature.

22) FBI signed plaintiff's name to Exhibit 11a and guaranteed the signature as that of plaintiff, although it had no authority to do so.

### DISCUSSION

I. *Federal Claims (First and Fifth Causes of Action)*

a. Statute of limitations

█ As a threshold matter, I must first discuss the statute of limitations as it applies to plaintiff's federal securities claims. Both defendants have pleaded the statute of limitations as an affirmative defense. The Second Circuit, in *Ceres Partners v. GEL Associates*, 918 F.2d 349 (2d Cir.1990), recently adopted a uniform limitations period for actions brought pursuant to the federal securities laws. *Ceres* rejected the long settled Second Circuit practice in implied causes of action brought pursuant to the federal securities laws of adopting a statute of limitations with reference to the pertinent laws of the forum state. The new rule, announced in *Ceres*, uniformly bars federal securities actions alleging

fraud commenced more than one year after discovery of the fraud or more than three years after accrual of the claim. 918 F.2d at 364.

Plaintiff's federal claims would be time-barred under the newly-announced *Ceres* rule. However, because plaintiff commenced this action on September 18, 1989, well before the rule in *Ceres* was announced, I must determine whether the new limitations rule should be applied retroactively to bar plaintiff's federal claims. I find that it should not.

The Second Circuit addressed this very question in *Welch v. Cadre Capital*, 923 F.2d 989 (2d Cir.1991). There, plaintiffs commenced an action on October 17, 1988 alleging, *inter alia*, violations of the federal securities laws. Although timely under pre-*Ceres* law, plaintiff's federal claims were untimely under the new uniform federal limitations period. However, the Court applied the three factor test articulated in *Chevron Oil Company v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), and concluded that *Ceres* was not to be applied retroactively to bar plaintiffs' claims.

The three part *Chevron* test provides a framework for determining when a court should give nonretroactive application to a decision announcing a new rule of law, rather than follow the general practice of applying new decisions retroactively. First, "[t]o qualify for purely prospective application, a decision 'must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed.'" *Welch*, 923 F.2d at 993, quoting *Chevron*, 404 U.S. at 106, 92 S.Ct. at 355. This first part of the test is mandatory; if established, the court must then proceed to balance the second and third factors. *Welch*, 923 F.2d at 993.[1] *Welch* holds that the rule announced in *Ceres* meets the threshold first *Chevron* requirement because it overruled the clear-

---

1. *Welch* makes clear that once the first *Chevron* factor is established, this "balancing process" does not require that both the second and third factors be met.

ly established precedent of borrowing the state limitations period and adopted for the Circuit a uniform federal limitations period. *Welch*, 923 F.2d at 993.

The second *Chevron* factor involves a determination of whether retroactive application would "further or retard ... operation" of the rule. 404 U.S. at 107, 92 S.Ct. at 355–56. *Welch* held that retroactive application of the *Ceres* rule would not further its operation because application of a period of limitations not yet in effect at the time a lawsuit was commenced does not further either of the dual purposes of statutes of limitation, namely, giving notice both to potential plaintiffs of the time within which suit must commence and to potential defendants of the time beyond which exposure to liability ceases. *Welch*, 923 F.2d at 995. Furthermore, purely prospective application of the *Ceres* rule, which would allow the "continuation of a handful of lawsuits filed within the longer time limits of previously applicable state law" *Welch*, 923 F.2d at 995, would not impair the purposes of the federal securities laws themselves.

The third *Chevron* factor requires the court to consider whether retroactive application would produce inequitable results. *Welch*, 923 F.2d at 993. Unlike *Welch*, the equities here do not tip decidedly in plaintiff's favor. Plaintiff was less than diligent in monitoring his account and, according to his own testimony, in failing to notice until April or May of 1988 that he did not possess the certificates representing the stock he had purchased in 1983. Furthermore, no testimony suggests that either defendant actively concealed the alleged fraud. *See Welch*, 923 F.2d at 995. On the other hand, plaintiff did commence suit promptly after he claims to have become aware of the missing certificate.[2] Therefore, in balancing the second and third *Chevron* factors, I conclude that the

balance tips in favor of nonretroactive application, and plaintiff's federal securities claims are not barred by the one year/three year rule announced in *Ceres*.

■ Therefore, I must apply the limitations rule as it existed before *Ceres* was decided. Under pre-*Ceres* law, actions brought in federal district courts sitting in New York were governed by the New York statute of limitations for actions based on common law fraud. *Armstrong v. McAlpin*, 699 F.2d 79, 86 (2d Cir.1983). The applicable statute requires plaintiff to commence such an action within six years from the time the cause of action accrued or within two years of the time the wrongdoing was, or with reasonable diligence should have been, discovered. CPLR 213(8); CPLR 203(f); *Armstrong*, 699 F.2d at 87.

Plaintiff commenced this action by filing the original complaint on September 18, 1989.[3] The earliest date on which plaintiff's cause of action could have accrued was September 19, 1983, the date on which plaintiff's activity statement falsely indicates that FBI had delivered the Lubrizol stock to plaintiff. Thus, plaintiff's action, by one day, was commenced within six years from the time the cause of action accrued, and is therefore timely under pre-*Ceres* law. Consequently, I need not address whether plaintiff could have, with the exercise of reasonable diligence, discovered the alleged fraud more than two years before he commenced this action on September 18, 1989.

b. Merits

■ I now turn to the merits of plaintiff's First and Fifth Causes of Action. To prevail on these claims, plaintiff must prove by a preponderance of the evidence that in connection with plaintiff's purchase or sale of a security, defendants intentionally employed a device, scheme or artifice

**2.** In making this observation, I do not address the issue of whether, with the exercise of reasonable diligence, plaintiff could have discovered the alleged fraud before 1988.

**3.** When an action is based on federal law, and the absence of an express federal statute of

limitations makes it necessary for the Court to borrow a limitations period from another statute, the action is deemed "commenced" under Fed.R.Civ.P. 3 when the complaint is filed. *West v. Conrail*, 481 U.S. 35, 39, 107 S.Ct. 1538, 1541–42, 95 L.Ed.2d 32 (1987).

to defraud or engaged in a fraudulent act, practice or course of business by use of any means of interstate commerce, the mails or of any facility of the national securities exchange, and plaintiff was damaged thereby. 15 U.S.C. § 78j(b); S.E.C. Rule 10b–5, 17 C.F.R. 240.10b–5; *Bloor v. Carro, Spanblock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985).[4] I find that plaintiff has failed to meet its burden with regard to either defendant because the proof does not establish that the alleged fraud was committed "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b).

To satisfy the "in connection with" requirement, the steps taken by the defendant to effectuate the alleged fraudulent scheme must be "integral to the purchase and sale of the security in question...." *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986). The evidence presented at trial establishes that in June 1983, plaintiff paid for, but never received, 1500 shares of the common stock of Lubrizol Corporation. Approximately four months later, FBI caused to be cancelled a certificate in plaintiff's name representing 1500 shares of Lubrizol stock and deposited the shares in its own account. Such cancellation was accomplished by use of a stock power (Exhibit 11a), purportedly bearing plaintiff's signature, which signature allegedly was affixed and guaranteed by FBI although FBI had no authority to do so. Even assuming, *arguendo*, that these actions were taken with the intent to defraud plaintiff, such evidence at best establishes "no more than a conversion of property that happened to involve securities." *Pross*, 784 F.2d at 459. The Second Circuit is "unwilling to extend the reach of the securities law to every

conversion or theft of a security." *Id. See also Bochicchio v. Smith Barney, Harris Upham & Co., Inc.*, 647 F.Supp. 1426 (S.D. N.Y.1986) ("[t]he conversion of securities, even if it occurs from a brokerage account, does not state a claim under § 10(b)."); *Bosio v. Norbay Securities, Inc.*, 599 F.Supp. 1563, 1567 (E.D.N.Y.1985) (claim that defendants failed to transmit to plaintiff the proceeds of a sale of stock did not state federal securities claim).

Further, for the fraudulent scheme to have been integral to the securities transaction, "the 'fraud practiced must have been *prior to or contemporaneous with* the sale of securities'." *Bosio*, 599 F.Supp. at 1566 (emphasis in original), quoting *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1227 (S.D.N.Y.1982). The "in connection with" requirement is not met if the fraud "... occur[s] only well after the securities transaction has been completed." *Pross*, 784 F.2d at 459. In *Pross*, plaintiff invested in a number of real estate ventures which were to be managed by defendants. Defendants subsequently carried out a fraudulent scheme which divested plaintiff of his ownership interest in the ventures.[5] The Court held that "an intent to cause a conversion of ownership interests at some uncertain future time and through uncertain means does not bring federal law into play, even though that intent is held at the time a purchase or sale of securities occurs." 784 F.2d at 459. This holding was based in part on the fact that the plaintiff in no way had been prevented from selling his interest in the investment in question after he purchased it but before the alleged fraud occurred. 784 F.2d at 457.

---

**4.** Plaintiff has not attempted to establish in this action that defendants misrepresented or failed to disclose a. material fact pertaining to the Lubrizol stock.

**5.** A principal step in this scheme involved securing from plaintiff his signature on a number of blank stock powers which one defendant then allegedly used to transfer plaintiff's securities to himself and other defendants. 784 F.2d at 456–57. The court stated that "a securities transaction that entails as one of its integral steps the fraudulent securing of blank signature pages for purposes of a later conversion alleges a fraud 'in

connection with the purchase of sale' of securities," and remanded the case to allow plaintiff to amend his complaint to allege more particularly the facts surrounding the preparation of the signature pages. 784 F.2d at 459–60. In the instant case, however, plaintiff has failed to prove defendant committed any such overt acts in furtherance of the fraudulent scheme contemporaneously with plaintiff's purchase of the Lubrizol stock, which acts would place the alleged scheme "in connection with" such purchase.

In the instant case, plaintiff bought and paid for the 1500 shares of Lubrizol in June 1983 and the shares were in his account until at least August 26, 1983. (See Exhibit 5). During that time, plaintiff was not incapacitated from selling the stock, if he so desired. The alleged fraud occurred at the earliest on or about September 19, 1983, the date the entry on plaintiff's activity statement falsely indicated the delivery of the Lubrizol stock to plaintiff. Therefore, the transaction was completed before the alleged fraud occurred and plaintiff has not shown that the fraud was in connection with his purchase of the Lubrizol stock.

For the above reasons, judgment is rendered in favor of defendants on plaintiff's First and Fifth Causes of Action.

## II. State Law Claims

### 1. Common law fraud (Second and Sixth Causes of Action)

For plaintiff to prevail on his common law fraud claims, he must prove, by clear and convincing evidence, that he justifiably relied upon a false representation of material fact made by a defendant with intent to deceive him, and that he was damaged thereby. *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 217 (1969). Plaintiff urges that defendants engaged in a fraudulent scheme,[6] and that the principal fraudulent act in this scheme was the forging of plaintiff's signature on the blank stock power (Exhibit 11a). Such activity, if proven, would constitute a misrepresentation of a material fact. However, I find that plaintiff has failed to meet his burden because he has not presented direct or circumstantial evidence sufficient to establish, under a clear and convincing evidence standard, that Brown made any false representations in furtherance of the alleged scheme, or that FBI possessed the requisite intent to deceive plaintiff.

### a. Brown

■ Plaintiff's proof shows that the signature on Exhibit 11a was affixed by some-

one other than himself. However, I find credible the testimony of both Barbara Leigh Klucik, presently Brown's chief financial officer and chief compliance officer, and Herbert Harvey, the president of Brown, that Exhibit 11a is not a form of stock power that has ever been used at Brown. Therefore, the proof does not show that anyone at Brown signed plaintiff's name to Exhibit 11a. Thus, plaintiff's common law fraud claim against defendant Brown fails for want of a misrepresentation by Brown.

### b. FBI

■ Plaintiff's proof establishes that FBI made two false representations. First, plaintiff's activity statement for the period of August 27, 1983 through September 30, 1983 (Exhibit 6), falsely states that the 1500 shares of Lubrizol stock were delivered to plaintiff on September 19, 1983. Second, although not conceded by FBI, plaintiff establishes by circumstantial evidence that someone at FBI signed plaintiff's name to Exhibit 11a, and plaintiff further establishes that FBI subsequently guaranteed the false signature as that of the plaintiff. Nonetheless, plaintiff's common law fraud claim against FBI fails because plaintiff has not shown that either representation was made with the intent to deceive plaintiff.

Under New York law, plaintiff may establish intent to deceive by showing that FBI knew at the time it made the representation that such representation was false. *United National Bank v. Ettinger*, 59 A.D.2d 584, 397 N.Y.S.2d 455, 456 (3d Dep't), *appeal dismissed*, 42 N.Y.2d 1061, 399 N.Y.S.2d 217, 369 N.E.2d 773 (1977). Regarding the misrepresentation on Exhibit 6, the evidence presented does not show that FBI knew it had not delivered the Lubrizol stock to plaintiff when it represented on the activity statement that it did so. Therefore, plaintiff has failed to show intent to deceive with regard to Exhibit 6.

---

**6.** Plaintiff describes the fraud in his trial memorandum as a "trick, device or scheme." (Plain-

tiff's Memorandum of Law, dated December 28, 1990).

Regarding the signature on the stock power, FBI certainly knew at the time it signed plaintiff's name to Exhibit 11a that it was falsely representing that plaintiff had signed the stock power. However, testimony given by Ms. Klucik of Brown and Elizabeth Andrie, a claims researcher at FBI and the custodian of FBI's records, as well as the documentary evidence admitted at trial, prevents me from concluding that FBI made this false representation with the intent to deceive plaintiff.[7] More likely, as more fully developed below, FBI affixed plaintiff's signature to the stock power, albeit wrongfully, to enable FBI to perform routine services for Brown under the Agreement.

Ms. Klucik testified that, based on repeated complaints Brown had received from its customers that securities were not being timely shipped, Brown was dissatisfied with FBI's performance under the Agreement. The untimely delivery of stock from FBI to Brown's customers occurred so frequently, that by October 1983, Brown had decided to terminate its relationship with FBI and was in the process of doing so. Plaintiff presented no clear and convincing evidence to persuade me that FBI's mishandling of plaintiff's Lubrizol stock was anything other than another instance of poor performance by FBI under its Agreement with Brown.

The documentary evidence further weakens plaintiff's showing as to FBI's intent. Exhibit 12, a series of activity statements for Thomas Flickinger's account, reflects the following relevant activity: (1) On June 1, 1983, Thomas purchased 400 shares of Lubrizol stock; (2) On October 31, 1983, 1500 shares of Lubrizol stock were converted from FBI to Pershing for Thomas' account; (3) Because Thomas' account only contained 400 shares of Lubrizol stock which he had purchased on June 1, 1983, the activity statement reflected that, as of October 31, his account was short 1100 shares of Lubrizol; and (4) The October 31 conversion was later discovered as erroneous and the conversion was reversed on

November 16, 1983. Further, Miss Andrie pointed out that the handwritten figures "3J6–018051–1" appear on the face of Exhibit 11 (1500 shares of Lubrizol in plaintiff's name) in the upper right hand corner. These figures correspond to *Thomas* Flickinger's Pershing account number. (See Exhibit 13). Miss Andrie also testified that the documentary evidence indicates that a FBI delivery ticket dated September 14, 1983, directing delivery out of safekeeping to plaintiff of 1500 shares of Lubrizol stock (Exhibit 44) was accompanied by Stock Certificate No. NB44414, representing *400* shares of Lubrizol stock, registered in the name of *Thomas* R. Flickinger (Exhibit 45).

The testimony and documentary evidence thus suggests that FBI: (1) carelessly converted to Pershing 1500 shares of Lubrizol stock in Thomas' account that it should have converted in plaintiff's account, (2) erroneously sent Certificate No. NB44414 evidencing 400 shares of Lubrizol to plaintiff when it should have sent it to Thomas, and (3) later affixed plaintiff's signature to Exhibit 11a in order to cancel Certificate No. NB44416 evidencing 1500 shares of Lubrizol, attempting to correct the short position it had created in Thomas' account. This is not to say that the evidence establishes, by a preponderance or otherwise, that this is what in fact occurred. However, after sifting through the evidence presented at trial, the testimony and documents prevent me from concluding that plaintiff has sustained his burden of establishing by clear and convincing evidence that FBI signed Exhibit 11a with the intent to deceive plaintiff.

For the above reasons, judgment is rendered in favor of defendants on plaintiff's Second and Sixth Causes of Action.

### 2. Breach of Contract (Third and Seventh Causes of Action)

■ Plaintiff has also failed to show that a contract existed between himself and either Brown or FBI. Plaintiff bears the

---

**7.** I have considered that Miss Andrie was not employed by FBI or any of its predecessors when the events which give rise to this lawsuit occurred and have weighted her testimony accordingly.

burden of proving the terms of the alleged contract and that either Brown or FBI failed to perform its obligations under those terms. *Bazak International Corp. v. Mast Industries, Inc.,* 73 N.Y.2d 113, 122, 538 N.Y.S.2d 503, 507, 535 N.E.2d 633, 637 (1989). No written agreement existed between plaintiff and either defendant. Further, no evidence presented at trial establishes that either defendant expressly agreed orally with plaintiff to enter into a contract. Therefore, plaintiff has failed to show that an express contract existed between him and either Brown or FBI.

Under New York law, "a contract implied in fact may result as an inference from the facts and circumstances of the case, although not expressly stated in words" by the parties. *Jemzura v. Jemzura,* 36 N.Y.2d 496, 503–504, 369 N.Y.S.2d 400, 408, 330 N.E.2d 414, 420 (1975); *Estate of Argersinger,* App.Div., 564 N.Y.S.2d 214, 215 (3d Dep't 1990). Such a contract "is derived from the 'presumed' intention of the parties as indicated by their conduct...." *Jemzura,* 369 N.Y.S.2d at 408, 330 N.E.2d at 420. As with a case involving an express contract, "the burden of proving the existence, terms and validity of a contract [implied in fact] rests on the party seeking to enforce it." *Paz v. Singer Co.,* 151 A.D.2d 234, 235, 542 N.Y.S.2d 10, 11 (1st Dep't 1989). Plaintiff's proof was similarly deficient in establishing that a contract implied in fact existed between it and either Brown or FBI.

#### a. FBI

■ Plaintiff produced no evidence of FBI's conduct from which I could infer that plaintiff and FBI intended to form a contract. Plaintiff testified that, on those occasions when he made decisions regarding his securities portfolio, he dealt directly with Mr. Harvey from Brown. He did not recall ever having any direct dealings or contract with FBI, and was not even aware that the Agreement between Brown and FBI existed.

#### b. Brown

■ Although plaintiff established that he and Brown had engaged in a course of dealing for over twenty years during which time Brown provided investment services to plaintiff and plaintiff paid for them, this alone is insufficient to permit me to infer the existence of a contract implied in fact. A court cannot enforce the terms of an alleged agreement when the party seeking enforcement has not established what those terms are. Here, plaintiff states in conclusory terms that he sustained his loss because he and Brown had a contract and Brown breached its terms. This does little more than state a prima facie case for breach of contract, and is inadequate to compel entry of judgment in favor of plaintiff.[8]

For the above reasons, judgment is rendered in favor of defendants on plaintiff's Third and Seventh Causes of Action.

#### 3. Breach of fiduciary duty (Fourth and Eighth Causes of Action)

Finally, plaintiff also fails to establish that he is entitled to recover on his claims alleging breach of fiduciary duty. A fiduciary relationship "is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Apple Records, Inc. v. Capitol Records, Inc.,* 137 A.D.2d 50, 529 N.Y.S.2d 279, 283 (1st Dep't 1988); *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 904 (2d Dep't 1976), *appeal dismissed,* 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977). Although "[t]he exact limits of such a relationship are impossible of statement ... [it] exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Penato,* 383 N.Y.S.2d at 904. " 'A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Mandelblatt v. Devon Stores, Inc.,*

---

**8.** Thomas Flickinger was perhaps the individual who was most competent to testify as to the terms of the alleged contract. However, he did not testify, even though he was listed on plaintiff's witness list, and as a possible rebuttal witness on FBI's list.

132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1st Dep't 1987), quoting Restatement (Second) of Torts § 874, comment a.

### a. FBI

Given this formulation, plaintiff has not shown that FBI owed him a fiduciary duty. Plaintiff never had any dealings with FBI and did not know that FBI was acting as clearing agent for Brown. In short, plaintiff never even knew FBI existed. Plaintiff presented absolutely no evidence from which I could find that a fiduciary relationship existed between him and FBI. *See Ross v. Bolton,* 904 F.2d 819, 826 (2d Cir.1990) (clearing agent did not have "any relationship with investors . . ."); *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 484 (2d Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980) (". . . a clearing agent . . . is generally under no fiduciary duty to the owners of the securities that pass through its hands.").

### b. Brown

A fiduciary relationship did exist between plaintiff and Brown. The Supreme Court has recognized that an investment advisor owes fiduciary obligations to its clients. *S.E.C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 189–90, 84 S.Ct. 275, 281–82, 11 L.Ed.2d 237 (1963). Plaintiff and Brown have enjoyed a long-standing relationship during which Brown provided investment securities advice and services to plaintiff. This relationship had continued at least up to the time of trial in this action.

However, plaintiff has failed to show that Brown breached its fiduciary obligation to plaintiff. Ms. Klucik recounted the steps she took in September 1983 when it was discovered that plaintiff had not yet received the Lubrizol stock he had purchased in June. She wired FBI on September 13, 1983 to inform FBI that Brown's records showed that 1500 shares of Lubrizol stock and 1200 shares of Anthem Electronics stock were being held in safekeeping by FBI for plaintiff and requested that FBI mail those securities to plaintiff.

Six days later on September 19, Brown's computer link-up with FBI showed that the securities had been delivered to plaintiff. This delivery is reflected, although falsely, on plaintiff's activity statement for the period from August 27, 1983 through September 30, 1983 (Exhibit 6). When questioned on cross-examination why, in light the problems Brown had been having with FBI, Ms. Klucik did not confirm delivery with plaintiff, she explained that the previous problems with FBI had been in the nature of nondelivery, not misdelivery.

This evidence does not establish that Brown breached its fiduciary duty to plaintiff. To succeed on this claim, plaintiff was required to show some "deceitful intent" on Brown's part. *Horn v. 440 East 57th Co.,* 151 A.D.2d 112, 547 N.Y.S.2d 1, 5 (1st Dep't 1989). *See also Apple Records,* 529 N.Y.S.2d at 283 (recognizing a breach of a fiduciary duty where a "special relationship of trust and confidence" has been "betrayed"); *Penato,* 383 N.Y.S.2d at 904 (relationship exists where "influence has been acquired and abused . . ."). Plaintiff has not made such a showing with regard to Brown.

For the above reasons, judgment is rendered in favor of defendants on plaintiff's Fourth and Eighth Causes of Action.

### CONCLUSION

For the reasons articulated above, judgment is rendered in favor of defendants on all plaintiff's causes of action.

### ORDER

IT HEREBY IS ORDERED, that judgment is rendered in favor of defendants on all plaintiff's causes of action.

IT FURTHER IS ORDERED, that the Clerk of the United States District Court for the Western District of New York is directed to enter final judgment in favor of defendants in accordance with this decision.

SO ORDERED.