**William S. FLICKINGER, Plaintiff,**

v.

**HAROLD C. BROWN & CO., INC. and Bradford Broker Settlement, Inc. n/k/a Fidata Corporation, Defendants.**

**No. 89–CV–1218S.**

United States District Court,
W.D. New York.

April 6, 1992.

Martin J. Zuffranieri, Gibson, McAskill & Crosby, Buffalo, N.Y., for plaintiff.

Victor T. Fuzak, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y., Louis J. Maione, Salon Marrow Dyckman, New York City, for defendants.

## DECISION AND ORDER

SKRETNY, District Judge.

Plaintiff William S. Flickinger brought this action against defendants Harold C. Brown & Co. ("Brown") and Bradford Broker Settlement, Inc., n/k/a Fidata Brokerage, Inc. ("BBSI"), for violation of the federal securities laws, fraud, breach of contract and breach of fiduciary duty. After a nonjury trial, I found in favor of defendants on all plaintiff's claims. 759 F.Supp. 992.

The Second Circuit affirmed my decision in part, reversed it in part and remanded it

for proceedings in accordance with its opinion. 947 F.2d 595. Specifically, the Second Circuit found, contrary to my decision, that plaintiff had shown that a contract existed between him and Brown and that Brown breached that contract. Further, the Second Circuit found that plaintiff was a third-party beneficiary of the Fully Disclosed Clearing Agreement (the "Agreement") between Brown and BBSI, that BBSI breached the Agreement and plaintiff thus was entitled to assert a claim directly against BBSI based on that breach. Accordingly, the Second Circuit directed that judgment be entered for plaintiff against both Brown and BBSI on plaintiff's breach of contract claims and remanded the matter to me for a determination of damages and a resolution of Brown's cross-claims against BBSI for indemnity. 947 F.2d at 599–601.

All parties submitted memoranda of law addressing these matters. I also heard oral argument on February 5, 1992.

## FACTS

My findings of fact after trial are set forth in detail in my previous Decision and Order, with which familiarity by the parties is assumed. 759 F.Supp. at 994–96. The Second Circuit did not disturb these findings.

Further, I make the following findings of fact relevant to the questions of damages and Brown's cross-claims:

1) Plaintiff first became aware in April 1988 that the stock certificates representing 1,500 shares of Lubrizol Corporation stock had not been delivered to him. Sometime in April or May 1988, plaintiff notified his attorney and defendant Brown that he was missing the shares of Lubrizol.

2) After purchasing the 1,500 shares of Lubrizol on or about June 1, 1983, plaintiff received a dividend payment of $405.00 on

the stock in 1983. He thereafter received no further dividend payments.

3) Brown gave BBSI prompt Notice of Brown's claim for indemnity against BBSI, pursuant to paragraph 6.3 of the Agreement between Brown and BBSI.

## DISCUSSION

### I. Amount of Damages

Two issues must be resolved to determine the amount of damages to which plaintiff is entitled: (1) the time at which the value of the 1,500 shares of Lubrizol is to be measured, and (2) the extent, if any, to which plaintiff is entitled to recover dividends on the 1,500 shares.

Plaintiff argues that a successful plaintiff in a contract action may recover "... the amount necessary to put [him] in the same economic position he would have been in had the defendant fulfilled his contract." *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 92 (2d Cir.1984). From this general principle, plaintiff argues that had defendants performed the respective contracts he would still be the registered owner of 1,500 shares of Lubrizol Corporation stock and would have received all dividends paid on the stock since October 1983. Therefore, he argues that to be made whole, he must recover: (1) the current market value of 1,500 shares of Lubrizol stock [1]; (2) the aggregate dividends paid on Lubrizol stock between October 1, 1983 and the date of judgment [2]; and (3) prejudgment interest at 9 percent per annum on each dividend he did not receive.

BBSI [3] responds that where the breach of contract is non-delivery of shares of stock, the proper measure of damages "is determined by loss or gain prevented at the time and place of breach." *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971). Ac-

---

1. At the close of business on December 18, 1991, Lubrizol was trading at $53.125 per share. The value of 1,500 shares as of that date would therefore be $79,687.50.

2. From October 1, 1983 and December 10, 1991, 1,500 shares of Lubrizol had paid aggregate dividends of $15,930.00.

3. Inexplicably, Brown's memorandum of law does not address the proper method of calculating plaintiff's damages, but is limited to the issue of its cross-claims against BBSI.

cordingly, BBSI argues that plaintiff may recover only the value of the stock at the time of the breach, which occurred in September 1983 upon defendants' failure to deliver the stock certificates. (BBSI's memo at 12). BBSI further argues that plaintiff may not recover dividends earned on the stock because he failed to mitigate his damages under § 2–711 of New York's Uniform Commercial Code ("UCC"). BBSI argues that pursuant to this "cover" provision of the UCC, plaintiff was required to purchase replacement stock upon the failure to deliver. (BBSI's memo, at 14). If plaintiff had done so, he would thereafter have received the dividends himself and at his own risk. BBSI argues that awarding plaintiff over eight years of dividends would enable plaintiff to have speculated on the market for that period entirely at the risk of the seller. (Id., at 15).

Plaintiff replies that a requirement that he "cover" the lost stock by purchasing an additional 1,500 shares when he became aware of the nondelivery would have forced him to pay twice for 1,500 shares of Lubrizol, thereby increasing his damages rather than mitigating them. (Plaintiff's reply). Plaintiff also argues that the cases BBSI cites for the proposition that plaintiff was required to cover the stock are factually distinguishable for various reasons. However, plaintiff cites no case in which a plaintiff, entitled to recover pursuant to any legal theory for a wrongful non-delivery of stock, was awarded the full value of the stock at the time of judgment. Therefore, absent a case directly on point, I find that *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136, 139 (2d Cir. 1983) is controlling.

### a. Valuation of the Stock

*Schultz* articulated the rule for "... measuring damages where stock or 'properties of like character' ... were converted,

not delivered according to contractual or other legal obligation, or otherwise improperly manipulated." *Id.*, 716 F.2d at 141. (citation omitted). There, respondents effected an unauthorized sale of futures contracts from petitioner's commodity futures trading account, allegedly in violation of section 4b of the Commodity Exchange Act (7 U.S.C. § 6b).[4] The court stated that the proper measure of damages is the greater of either: (1) the value of the stock at the time of conversion, or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired. *Schultz, supra*, 716 F.2d at 141.[5]

■ The Second Circuit has determined in the instant case that Brown breached its contract with plaintiff when it failed to deliver the Lubrizol shares to him. Further, BBSI breached its contract with Brown when it failed to deliver the shares to plaintiff, and plaintiff may recover damages for that breach as a third party beneficiary to the Brown/BBSI contract. 947 F.2d at 600. Thus, the damages rule enunciated in *Schultz* is applicable in this case insofar as plaintiff's stock was "... not delivered according to [a] contractual ... obligation." *Schultz, supra*, 716 F.2d at 141.

Plaintiff testified at trial that he first discovered sometime in April 1988 that the stock certificate representing 1,500 shares of Lubrizol stock had not been delivered to him. (Transcript of proceedings before Hon. William M. Skretny, January 3, 1991 (hereinafter, "T"), at 79). Thus, applying the rule stated above, plaintiff may recover the value of the stock at the time of the non-delivery, or the highest value of the stock between the time plaintiff became aware of the non-delivery and a reasonable time thereafter, whichever value is greater.

4. The case was before the Court of Appeals on direct appeal from an order of the Commodity Futures Trading Commission pursuant to 7 U.S.C. § 18(g).

5. The court enunciated the rule in terms of a conversion because "the purpose of this rule is best exemplified in the case of a wrongful con-

version of stock." *Id.*, 716 F.2d at 140. However, as is evident from the quoted language above, the court said that the rule is likewise applicable in cases where stock "... was not delivered according to contractual or other legal obligation, or otherwise improperly manipulated." *Id.*, 716 F.2d at 141.

What constitutes a "reasonable time" will vary from case to case. *Schultz, supra,* 716 F.2d at 140.

> The purpose of the reasonable time rule is to allow the plaintiff "reasonable opportunity to consult counsel, to employ other brokers and to watch the market for the purpose of determining whether it is advisable to purchase on a particular day or when the stock reaches a particular quotation, and to raise funds if he decides to repurchase."

*Caballero v. Anselmo,* 759 F.Supp. 144, 149 (S.D.N.Y.1991), quoting *Gelb v. Zimet Bros., Inc.,* 34 Misc.2d 401, 402–03, 228 N.Y.S.2d 111, 113 (Sup.Ct.N.Y.County 1962), *aff'd,* 18 A.D.2d 967, 237 N.Y.S.2d 989 (1st Dept., 1963).

The stock involved in this case is publicly traded on the New York Stock Exchange and is therefore readily available to anyone with the resources to purchase it. For that reason, a "reasonable time" would be a relatively short period, perhaps ten days from the date of discovery. However, plaintiff's testimony failed to pinpoint the exact date on which he became aware of the nondelivery; plaintiff testified only that he believed he first became aware that he did not have a certificate for the Lubrizol in April 1988 (T at 79), and that he inquired to Brown about the missing stock and contacted his lawyer in "... either April or May of 1988." (T at 85). Inferring that a reasonable investor would contact his broker immediately upon discovery of missing stock and would contact his attorney shortly thereafter, I find that a "reasonable time" after discovery of the missing stock was the period between April 15, 1988 and May 15, 1988.

Unfortunately, the trial evidence is lacking as to the highest intermediate value of the stock during this period. Exhibit 30, admitted into evidence at trial, is a graph which depicts the price at which Lubrizol was trading between January 1983 and late 1990. However, the graph is not sufficiently detailed to enable me to determine precisely the highest intermediate value of the stock between April 15, 1988 and May 15, 1988. It appears from Exhibit 30, however, that Lubrizol was trading between approximately $33.00 and slightly over $38.00 per share during that period, significantly higher than it was in June 1983, when plaintiff bought and paid for the stock. Therefore, Exhibit 30 underscores the importance of determining more precisely the highest intermediate value of the stock during the relevant period, insofar as that intermediate value is the level at which the stock must be valued.

Given this lack of evidence, I find it necessary to take judicial notice of the fact that, during the period between April 15, 1988 and May 15, 1988, Lubrizol stock reached its highest intermediate value on April 19, 1988, when it closed at $38.50 per share. *Standard & Poor's Daily Stock Price Record, New York Stock Exchange,* April–May–June 1988, at 266. Therefore, plaintiff is entitled to recover for the non-delivery of the 1,500 shares of Lubrizol stock at the rate of valuation of $38.50 per share, for a total of $57,750.00.

### b. Dividends

■ I further find that plaintiff is entitled to recover all dividends declared on the stock on or before April 19, 1988. Accordingly, I reject both BBSI's argument that plaintiff is not entitled to any dividends because he failed to repurchase the stock pursuant to UCC § 2–711 immediately upon non-delivery and plaintiff's argument that he is entitled to recover dividends up to the date of judgment.

■ BBSI's argument runs counter to the rule espoused in *Schultz.* Pursuant to that rule, an investor gets the benefit of having the stock valued either at the time it was converted, not delivered or otherwise improperly manipulated, or at the time it was most valuable within a "reasonable time" after the investor realized such wrong had been committed, whichever value is greater. This "reasonable time" rule ensures that the stock will not be valued for damages purposes at a time before the injured investor had a sufficient opportunity under the circumstances to study the market and determine whether it would be prudent to repurchase the lost stock. Ac-

cordingly, it would be anomalous to rule that the investor may have this period during which to speculate but may not enjoy all the benefits of stock ownership, including dividends, while doing so.

■ By the same token, this same reasoning provides a logical point at which to cut off plaintiff's right to recover dividends. Under the rule, the injured investor is entitled to the highest intermediate value of the stock during a reasonable time after discovery of the wrong, during which time the investor may study the market and determine whether it is prudent to repurchase the stock. Given this benefit, it is reasonable to expect that the investor will decide either to repurchase or to not repurchase the stock during that time. Therefore, it is fair to burden the investor with the natural consequences of such action. If the investor were to decide that it was prudent to repurchase, one of the benefits of such repurchase would be entitlement to dividends, but at the investor's own risk. On the other hand, if the investor were to decide it was imprudent to repurchase, then a consequence of such inaction would be no further entitlement to dividends. Either way, the investor's entitlement to dividends solely at the wrongdoer's expense must be cut off at the point where the investor was in a position to make an informed decision with regard to the stock.

I realize that *Schultz, supra,* 716 F.2d at 140, states that "... the injured party is not actually required to enter the market to determine when he might have done so." However, an injured investor may not use this "no duty to repurchase" rule to recover as damages dividends declared on a stock after the investor was in a position to himself reenter the market if he so desired. *Schultz* was limited to the question of when to value the stock; in that regard it can work no injustice on the wrongdoer to award the investor the benefit of the highest intermediate value of the stock within a reasonable time, whether or not the investor took any action with regard to the stock

during that time. Indeed, as the *Schultz* court observed, a hard and fast rule requiring repurchase might require an investor to reinvest in the lost stock "... when steadily falling prices render such an investment imprudent, [and] would frustrate a rule which seeks to make an investor whole." *Id.,* 716 F.2d at 140.

■ However, irrespective of the investor's activity or inactivity during the reasonable time after discovery of the wrong, the very reason for fixing stock value within such a reasonable time is because it would be "... unjust to award as damages the value attained by the stock at a point in time well after an injured party who wanted to continue speculating in the market knew his shares were lost and could have replaced them." *Id.* Similarly, it would be unjust to award as damages dividends declared on stock after an investor knew the stock was missing and had sufficient time to replace it. Accordingly, plaintiff may recover the aggregate dividends declared on 1,500 shares of Lubrizol only between October 24, 1983, the date BBSI caused the certificate representing the shares to be canceled, and April 19, 1988, the date on which the stock reached its highest intermediate value.

The trial evidence as to dividends is comprehensive. Exhibit 32, admitted into evidence at trial, consists of eight photocopied pages of *Moody's Dividend Record,* showing the dividends paid on Lubrizol Corporation stock from 1983 through 1990. Exhibit 31, also admitted into evidence at trial, is a table accurately summarizing the relevant information contained in Exhibit 32. For ease of reference, trial Exhibit 31 is attached to this Decision and Order as Appendix A.

The evidence shows that plaintiff received $405.00 in dividends in 1983 and thereafter received no more dividends. According to Exhibit 32, this was the dividend declared on July 25, 1983 and payable September 9, 1983. Thereafter, dividends to which plaintiff is entitled were declared in the last quarter of 1983, in each of the four quarters of 1984, 1985, 1986 and 1987, and

in the first quarter of 1988.[6] Referring to Appendix A hereto, plaintiff may recover $405.00 representing 1983 dividends, $1,680.00 representing 1984, $1,740.00 representing 1985, $1,755.00 representing 1986, $1,830.00 representing 1987 and $480.00 representing the first dividend paid in 1988, for a total of $7,890.00.

### c. Prejudgment Interest

■ Finally, pursuant to 28 U.S.C. § 1961 and New York CPLR 5001, *et seq.*, plaintiff, as he argues (plaintiff's memo, at 5), is entitled to recover prejudgment interest at the rate of 9% per annum on each dividend he did not receive. Such rate of interest shall be calculated on each dividend from the date the dividend was payable, as set forth in Appendix A hereto, to the date of the entry of judgment.

## II. *Brown's Cross–Claims*

The Second Circuit also directed that I resolve Brown's cross-claims. 947 F.2d at 601. In its Answer to plaintiff's amended complaint, Brown asserted two cross-claims against BBSI. The first cross-claim seeks indemnification from BBSI on the grounds that if plaintiff obtains a judgment against Brown, Brown's liability would have been caused by BBSI's "... negligence, carelessness, fault or other illegal conduct...." The second cross-claim seeks contractual indemnification pursuant to the terms of the Agreement between Brown and BBSI.

### a. First Cross–Claim

■ Brown argues that BBSI should indemnify it because "... plaintiff's loss is entirely and exclusively the result of BBSI's improper conduct." (Brown's memo, at 2). Thus, this claim is one for "implied indemnification," whereby one party may shift the entire loss to another "... because of a separate duty owed by the indemnitee by the indemnitor, or because one of the two parties is considered actively negligent or the primary or principal wrongdoer." *Bellevue South Associates v. HRH Constr. Corp.*, 78 N.Y.2d 282, 296, 574 N.Y.S.2d 165, 171, 579 N.E.2d 195, 201 (1991).

In this case, not only was BBSI primarily responsible for non-delivery of the securities to plaintiff, but its failure to deliver them was in breach of a specific duty it owed to Brown under the Agreement.[7] I found in my previous Decision and Order that plaintiff purchased and paid for 1,500 shares of Lubrizol Corporation common stock, but never received a stock certificate evidencing his ownership. On September 19, 1983, BBSI falsely, although not necessarily intentionally, represented that it had delivered the stock to plaintiff. Thereafter, BBSI, by signing plaintiff's name to a stock power and guaranteeing the false signature, caused the stock certificate representing the 1,500 shares registered in plaintiff's name to be canceled. 759 F.Supp. at 995–96. These actions prevented the delivery of the shares to plaintiff. Thus, I find that BBSI was primarily responsible for the non-delivery.

Further, BBSI owed Brown an obligation under the Agreement to deliver securities to Brown's customers when so instructed. (Agreement, ¶ 3.4.6). As a direct result of BBSI's breach of this obligation, plaintiff failed to receive his securities and suffered damages as a result. In this regard, this case is analogous to *Mas v. Two Bridges Associates*, 75 N.Y.2d 680, 555 N.Y.S.2d 669, 554 N.E.2d 1257 (1990), in which the plaintiff recovered from the owner of a building and from an elevator company for injuries she sustained when an elevator in the building malfunctioned. The court found that the owner of the building was entitled to "implied indemnity" from the

---

**6.** A dividend was also declared on the stock in the second quarter of 1988. However, such declaration did not take place until April 23, after the cutoff date.

**7.** BBSI argues that Brown may not recover under a theory of "implied indemnity" because neither defendant has been adjudicated a tortfeasor. It is true that most of the reported cases discussing implied indemnification involve *tortfeasors* jointly liable to a common plaintiff. However, the rationale behind the theory does not preclude recovery by one defendant against the other where, as here, both defendants are liable to a common plaintiff in contract rather than in tort.

elevator company for that portion of plaintiff's damages attributable to the elevator company's failure to maintain and repair the elevator.[8] The court so found because the elevator company "... had voluntarily promised that it would inspect, repair and maintain the elevator and the Owner was entitled to rely on that promise and recover under settled rules of indemnity." *Id.*, 75 N.Y.2d at 691, 555 N.Y.S.2d at 675, 554 N.E.2d at 1263.

Likewise, BBSI promised Brown it would deliver securities to Brown's customers. Because it did not, plaintiff suffered damages. Therefore, Brown is entitled to rely on BBSI's promise and recover from BBSI on its first cross-claim.

b. Second Cross–Claim

Brown may also recover on its second cross-claim, which seeks contractual indemnity. A copy of the Agreement was admitted into evidence at trial as Exhibit 17. Paragraph 6.2 relates to BBSI's obligation to indemnify Brown and states in relevant part:

> BBSI agrees to indemnify Correspondent [Brown] ... and hold ... Correspondent ... harmless from and against any Claim arising out of or resulting from: (a) any failure or any alleged failure by BBSI (or any of its officers, directors, employees or agents) to carry out any responsibility assigned to it or assumed by it under this Agreement....

The Second Circuit found that BBSI breached its obligations under the Agreement in failing to deliver the 1,500 shares of Lubrizol to plaintiff. This is a "... failure ... by BBSI ... to carry out [a] responsibility assigned to it ... under this Agreement." Accordingly, BBSI is bound to indemnify and hold Brown harmless from plaintiff's claim against Brown for failure to deliver the 1,500 shares of Lubrizol.

BBSI argues that the Agreement provides for cross-indemnities, and points to paragraph 6.1 of the Agreement, which states in relevant part:

> Correspondent [Brown] hereby agrees to indemnify BBSI ... and hold ... BBSI ... harmless from and against any costs, losses, claims, liabilities, fines, penalties, damages and expenses (including reasonable attorneys' and accountants' fees) (collectively, the "Claim(s)") arising out of or resulting from: (a) any failure or any alleged failure by Correspondent ... to carry out any responsibility assigned to it or assumed by it under this Agreement; (b) any Claims made by any Customer against ... BBSI ... otherwise arising out of this Agreement or BBSI's performance of services hereunder; and (c) any breach of the representations and warranties made by Correspondent in or pursuant to this Agreement.

However, BBSI is not entitled to indemnity under this paragraph. To the extent that BBSI relies on subsections (a) or (c) of paragraph 6.1, there has been no finding that Brown has failed to "... carry out any responsibility assigned to it under [the] Agreement." Rather, Brown's liability to plaintiff is based upon breach of a contract it had directly with plaintiff.

To the extent that BBSI relies upon subparagraph (b), paragraph 6.3 of the Agreement states in relevant part:

> Whenever any Claim arises for indemnification hereunder, the party seeking indemnification shall give prompt notice (the "Notice of Claim") of the Claim to the indemnifying party, and when known, the facts forming the basis for such claim.

There is no evidence that BBSI ever complied with paragraph 6.3 and provided Brown with a Notice of Claim for indemnity,[9] and there can be absolutely no dispute that BBSI has not asserted a cross-claim against Brown in this lawsuit.

---

8. The jury in *Mas* apportioned fault 5% against plaintiff for her comparative negligence, 10% against the building owner for failure to provide assistance to plaintiff and 85% against the owner and the elevator company for failure to maintain and repair the elevator. *Mas, supra,* 75

N.Y.2d at 684, 555 N.Y.S.2d at 671, 554 N.E.2d at 1259.

9. In contrast, counsel for BBSI conceded at trial that Brown sent to BBSI a Notice of Claim. (T at 559).

Further, paragraph 5.3 of the Agreement provides:

> If an error is made in the execution or settlement of a Trade, or if a Customer suffers any loss by reason of an error of BBSI or Correspondent, the parties shall determine which party is responsible for the error by comparison of available hard copy records maintained by BBSI and/or Correspondent. The responsible (or paying) party shall promptly reimburse the other party or the Customer, as the case may be, for any amounts paid or losses incurred as a direct result of the error.

As I have discussed *infra,* I find that the failure to deliver the securities was a result of BBSI's error. Therefore, pursuant to paragraph 5.3, BBSI is responsible for the "amounts paid or losses incurred as a direct result of the error."

Accordingly, I find that Brown may also recover on its second cross-claim against BBSI, seeking indemnification pursuant to the Agreement.

## CONCLUSION

For the reasons more fully articulated above, plaintiff is entitled to recover $57,750.00 for the lost shares of Lubrizol, $7,890.00 in dividends plaintiff did not receive and prejudgment interest on each dividend, calculated at 9% per annum in accordance with CPLR 5004, from the date the dividend was payable to the date judgment is entered. Further, defendant Brown is entitled to indemnification from defendant BBSI for any amounts Brown pays to plaintiff pursuant to the terms of this Decision and Order.

## ORDER

IT HEREBY IS ORDERED, that plaintiff is entitled to recover the following damages caused by defendants' breach of contract:

(1) $57,750.00, representing the value of 1,500 shares of the common stock of Lubrizol Corporation on April 19, 1988; and

(2) $7,890.00, representing the aggregate dividends paid on 1,500 shares of the common stock of Lubrizol Corporation between October 24, 1983 and April 19, 1988; and

(3) interest on each of the unpaid dividends at 9% per annum, calculated from the date each dividend was payable to the date of the entry of judgment.

FURTHER, that judgment is rendered in favor of defendant Harold C. Brown & Co., Inc. on its cross-claims against defendant Bradford Broker Settlement, Inc., n/k/a Fidata Corporation.

FURTHER, that within ten (10) days of the date of this Decision and Order, plaintiff shall file and serve a memoranda calculating the amount of interest due him pursuant to this Decision and Order.

FURTHER, that within ten (10) days thereafter, defendants shall file and serve a response thereto, if any.

FURTHER, that this Court will thereafter, by separate Order, direct the Clerk of the Court to enter final judgment in accordance with this Decision and Order.

SO ORDERED.

## APPENDIX A
### Dividends on 1500 Shares Lubrizol Corp.
#### Period 10/1/83–12/31/90

| Year | Record Date | Payable Date | Rate | Amount | Subtotal |
|---|---|---|---|---|---|
| 1983 | 11/10 | 12/09 | .27 | 405.00 | 405.00 |
| 1984 | 2/10 | 3/09 | .27 | 405.00 | |
| | 5/10 | 6/08 | .27 | 405.00 | |
| | 8/10 | 9/10 | .29 | 435.00 | |
| | 11/09 | 12/10 | .29 | 435.00 | 1,680.00 |
| 1985 | 2/08 | 3/08 | .29 | 435.00 | |
| | 5/10 | 6/10 | .29 | 435.00 | |
| | 8/09 | 9/10 | .29 | 435.00 | |

| Year | Record Date | Payable Date | Rate | Amount | Subtotal |
|---|---|---|---|---|---|
|  | 11/09 | 12/10 | .29 | 435.00 | 1,740.00 |
| 1986 | 2/10 | 3/10 | .29 | 435.00 |  |
|  | 5/09 | 6/10 | .29 | 435.00 |  |
|  | 8/08 | 9/10 | .29 | 435.00 |  |
|  | 11/09 | 1/2/87 | .30 | 450.00 | 1,755.00 |
| 1987 | 2/10 | 3/10 | .30 | 450.00 |  |
|  | 5/08 | 6/10 | .30 | 450.00 |  |
|  | 8/10 | 9/10 | .30 | 450.00 |  |
|  | 11/10 | 1/4/88 | .32 | 480.00 | 1,830.00 |
| 1988 | 2/10 | 3/10 | .32 | 480.00 |  |
|  | 5/10 | 6/10 | .32 | 480.00 |  |
|  | 8/10 | 9/09 | .32 | 480.00 |  |
|  | 11/10 | 12/09 | .34 | 510.00 | 1,950.00 |
| 1989 | 2/10 | 3/10 | .34 | 510.00 |  |
|  | 5/10 | 6/09 | .34 | 510.00 |  |
|  | 8/10 | 9/08 | .34 | 510.00 |  |
|  | 11/10 | 12/08 | .36 | 540.00 | 2,070.00 |
| 1990 | 2/09 | 3/09 | .36 | 540.00 |  |
|  | 5/10 | 6/08 | .36 | 540.00 |  |
|  | 8/10 | 9/10 | .36 | 540.00 |  |
|  | 11/09 | 12/10 | .38 | 570.00 | 2,190.00 |
|  |  |  |  | Grand Total: | 13,620.00 |