Breitel, J.
In an action on an agreed statement of facts by an importer[1] for nondelivery of goods shipped under a marine bill of lading, the carrier appeals. The issue is the proper measure of damages for goods discovered lost by unexplained disappearance after a longshoremen’s strike at the port of destination, where the parties had agreed that the carrier was not liable for delays due to strikes.
On October 30,1968, defendant Moore-McCormack Lines, Inc., a common carrier, loaded 200 sacks of cloves on board its vessel the S. S. Mormacpenn at the Madagascar Port of Tamatave. Plaintiff J. M. Rodriguez & Co., Inc., an importer of food stuffs, purchased and received a clean, negotiable, “ on board ” bill of lading entitling it to delivery of the cloves in New York. The ship docked at the Port of New York on December 20, 1968, but was unable to discharge its cargo because of a longshoremen’s strike. The strike ended on February 15, 1969. Discharge of the vessel began, but no cloves were found on board.
The market value of the cloves in New York when the ship docked on December 19, 1968 was $19,680. At the strike’s end on February 15, 1969, the market value had risen to $41,070.
The bill of lading incorporated by reference and in part repeated the language of the Carriage of Goods by Sea Act (U. S. Code, tit. 46, § 1304). It exempted “the carrier from liability for loss or damage arising or resulting from * * * strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general ’ ’. This action to determine the appropriate measure of damages for the loss of the cloves was begun on June 2, 1969, ‘ ‘ within one year after delivery or the date when the goods should have been delivered ”, as required by the bill of lading at the Carriage of Goods by Sea Act (U. S. Code, tit. 46, § 1303, subd. [6]).
The Appellate Division, in a well-reasoned opinion, held that the value of the goods must be determined in February when the cause of action accrued, and that the strike-exemption clause had suspended the carrier’s obligation to deliver until the strike ended. Consequently, the court awarded damages of $41,070, the market value of the cloves on February 15, 1969.
*429 The carrier contends that the damages for the lost cloves should be determined as of the time when the ship arrived in port. The carrier argues that the strike clause should not be used to increase the amount of the importer’s damages.
The general rule is that damages for breach of contract are computed at the time of breach (Simon v. Electrospace Corp., 28 N Y 2d 136, 145, mot. to amd. remittitur den. 28 N Y 2d 809; Parker v. Hoppe, 257 N. Y. 333, 341; Hoppe v. Russo-Asiatic Bank, 235 N. Y. 37, 39; 25 C. J. S., Damages, § 74, at pp. 848, 850-851; 13 N. Y. Jur., Damages, § 43; cf. 11 Williston, Contracts [3d ed.], § 1339). This rule, as conceded by the parties, is applicable in admiralty. The measure of damages fdr nondelivery of goods is the value of the goods at the port of destination at the time when they should have been delivered (e.g., Goltzman v. Rougeot, 122 F. Supp. 700, 706; Rodocanachi, Sons & Co. v. Milburn Bros. [1887], 18 Q. B. 67, 76, 80; Bancroft v. Yazoo & M. V. R. R. Co., 194 La. 115, 118; 2 Carver’s Carriage by Sea [12th ed.], § 1458; Longley, Common Carriage of Cargo, p. 207; 13 C. J. S., Carriers, § 264, p. 609; 35 Halsbury’s Laws of England [3d ed.], § 678; cf. Porter v. Pennsylvania R. R. Co., 217 App. Div. 49, 54). The language of the Porter case (supra) is in point. The court stated that the ordinary measure of damages is ‘ ‘ the difference between the value of the goods at the time and place they ought to have been delivered or otherwise protected, and the time of their actual delivery, allowing a reasonable time after arrival for delivery ’ ’ (id., at p. 54). The court emphasized that “ [t]he measure of damages must be applied at the time the defendant’s failure of duty began ” (id., at p. 55).
The first clause of the bill of lading and subdivision (2) of section 1304 of the Carriage of Goods by Sea Act, quoted in part above, exempt a carrier from liability resulting from strikes. This provision, since it limits the common-law liability of the carrier, must be construed strictly against the carrier (Inland Waterways Corp. v. Hallet & Carey Co., 52 F. 2d 13, 15-16 [C. C. A. 8th]; 7 N. Y. Jur., Carriers, § 199; 13 C. J. S., Carriers, § 112; cf. Chenango Textile Corp. v. Willock, 247 App. Div. 638, 639-640; Feinberg Kosher Sausage Co. v. Watson Bros. Transp. Co., 101 F. Supp. 403, 406 [D. Minn.], affd. 193 F. 2d 283). Its effect where there is a strike preventing unloading *430 when the ship arrives in port is to suspend the duty of the carrier to deliver the goods and, in a proper case where the delay is the proximate cause, to relieve the carrier of liability for deterioration during the period of delay (cf. 35 Cyclopedia of Law and Procedure, p. 249, treating strike clauses in sales agreements). In order to benefit from the strike exemption clause, however, the carrier has the burden of proving that the strike caused the damage. (Schroeder Bros. v. The Saturnia, 226 F. 2d 147, 150 [C. C. A. 2d]; General Foods Corp. v. United States, 104 F. Supp. 629, 631 [S. D. N. Y.].) Moreover, if á strike threatens the damage or loss of goods, the carrier owes a duty to minimize or avert the loss by the exercise of reasonable care (Schroeder Bros. v. The Saturnia, supra; Gilmore and Black, The Law of Admiralty, p. 144).
Indeed, it has been stated as a generality that to allow benefit of an exemption clause the condition exempted must have been the proximate cause of the harm incurred (e.g., 13 C. J. S., Carriers, § 114, supra). Thus, the issue may be expressed as whether the strike caused only the delay in delivery or whether it also caused the total loss of the cargo.
The principles are illustrated by Badhwar v. Colorado Fuel & Iron Corp. (138 F. Supp. 595, 608 [S. D. N. Y.], affd. 245 F. 2d 903, 907 [C. C. A. 2d], cert. den. 355 U. S. 862). In the Badhwar case, 1,490 tons of caustic soda were loaded on September 2, 1948 aboard a vessel in New Orleans to be shipped to Bombay. On September 3, 1948, the ship’s crew went out on strike, and the vessel was delayed in leaving New Orleans for three months. The caustic soda was eventually delivered in good condition, but delivery was late, and in the interim the market price had fallen. In a suit by the buyer in Bombay against the carrier and the seller in New Orleans, the court held that the strike exemption clause of the Carriage of Goods by Sea Act excused the delay (138 F. Supp., at pp. 608-609, supra). Since the late delivery involved no breach, the carrier was not liable for the loss in market value (id.).
Tinder the bill of lading and the Carriage of Goods by Sea Act the Statute of Limitations for nondelivery of goods begins to run “when the goods should have been delivered” (U. S. Code, tit. 46, § 1303, subd. [6]; Hess Int. Corp. v. Isthmian S. S. Co., 5 A D 2d 250, 253; 54 N. Y. Jur., Ships and Shipping, § 173). *431 Under a familiar rule, any Statute of Limitations begins to run when the cause of action accrues (e.g., 1 Weinstein-Korn-Miller, N. Y. Civ. Prac., ¶ 201.02, subd. [b]). In the Badhwar case (supra), where delivery of the cargo of caustic soda was delayed about three months by a strike, the court stated, significantly it is suggested, that the Statute of Limitations began to run at the time of the delayed delivery (138 F. Supp., at pp. 614-615).
In the instant case, when the cloves were lost is unknown. Indeed, the cloves may have been bn board until just before the strike was over. If the goods had been delivered in good condition within a reasonable time after the strike was over, the Badhwar case (supra) teaches that there would have been no breach. It was only when the carrier failed to deliver on February 15, 1969 that the carrier then violated its duty to the importer and it is the market value on that day which fixes the amount of damages. The total loss of the goods was due to the fault or allocable to the responsibility of the carrier or its servants, either on loading, in transit, or on unloading, and not to the strike. Consequently, the strike was not the proximate cause of the loss, but only of the delay in effecting delivery.
(It may also be noted that there is no question of anticipatory breach since the carrier did not, and indeed because of its own lack of knowledge of the loss, could not have informed the importer before February 15, 1969 of its inability to perform [see, generally, regarding doctrine of anticipatory or prospective breach, 11 Williston, Contracts (3d ed.), § 1300 et seq., supra].)
A more general statement of the measure of damages for nondelivery of goods reflecting the reasoning behind the rule and supporting the analysis above is found in the case The Merauke (31 F. 2d 974 [C. C. A. 2d]). The court stated that “ [the shipper’s] loss by the carrier’s breach of contract is the difference between what his position would have been, had the contract been performed, and his situation as it is ” (id., at p. 975; see, generally, 11 Williston, Contracts [3d ed.], § 1338, p. 198, supra). Given the longshoremen’s strike for which neither party was responsible, the importer expected to receive the cloves when the strike was over. To put the importer in the *432 position it would have been if delivery had been made, the carrier must pay the market value as of the end of the strike.
Allowing the carrier to choose the time for fixing damages either at the beginning or end (or perhaps the middle) of the strike, whenever the market price was lowest, would lead to an undesirable rule for future cases. It is possible in another case involving a fly-by-night carrier with one or two ships, unlike the carrier here, that a carrier might be tempted to convert the goods. If damages are fixed when the ship first docked and then the price of the cloves increases, the carrier might have an incentive to convert the cloves, sell them on the open market, and stand the damages.
In any event, the goods disappeared while the goods were in the carrier’s charge; it is not improbable that employees of the carrier or longshoremen stole the goods. If the carrier’s employees are responsible for the loss, the ultimate responsibility rests with the carrier, whether in the choice of employees or the failure to protect the goods.
Other reasons for awarding the importer the market value of the lost cloves when the loss was discovered and delivery failed are apparent from examining the practical business problems faced by the importer. Indeed, it could not have, by way of hedge, purchased more cloves in the interim, without remaining obligated to accept delivery of the cargo when the strike was over. But when delivery should have been possible and the loss was discovered, the importer had to buy other cloves to perform its obligations to third parties, or suffer damages. The market price at that point would determine its loss, and not the price when the goods would have been delivered absent a strike, while it still had no knowledge of the loss (see Uniform Commercial Code, § 2-713 and Official Comment No. 1).
The carrier argues that it should not be held to a greater amount in damages than it would have been were there no strike provision in the bill of lading. The carrier ignores, however, the sharp distinction between clauses limiting liability and those limiting the measure of damages.
The carrier would rely on subdivision (2) of section 1304 of the Carriage of Goods by Sea Act to limit the amount of damages. It exempts carriers from “loss or damage” resulting from numerous “ [u]ncontrollable causes of loss ”, as subdivi *433 sion (2) of that section is entitled. They include acts of God, acts of war, quarantine restrictions, strikes (as in this instance), riots, and insufficiency of packing to name a few (U. S. Code, tit. 46, § 1304, subd. [2], pars, [d], [e], [h], [j], [k], and [n]). Thus, the section relied on by the carrier to limit damages only affects liability, excusing the carrier where partial loss is occasioned by one of the specified causes.
By contrast, a different subdivision of section 1304 (subd. [5]) deals with “ [a]mount of liability; valuation of cargo ”, as it is entitled. It places a limit on the general rule, stated above, that the measure of damages for nondelivery of goods is the value at the time and place the goods should have been delivered. It also modifies the common-law rule that a carrier may not limit its liability for loss or injury caused by its own negligence (13 C. J. S., Carriers, § 99). The subdivision places a per package limit of $500 on the carrier’s liability. An exception is made if the nature of the goods and a higher value have been declared by the shipper (U. S. Code, tit. 46, § 1304, subd. [5]). The subdivision forbids the carrier from limiting the maximum per package value to ‘1 less than the figure above named ” (id.). The next sentence provides that “ [i]n no event shall the carrier be liable for more than the amount of damage actually sustained ” (id.).[2]
It is quite significant that the statute treats particularly with clauses for each exemption from liability or limitation on damages. For whatever reason, the draftsmen did not use omnibus or flexible exemption or limitation clauses. Perhaps, the reasons are historical and the resistance to upsetting traditional broad common-law liability of carriers. But Whatever may be the reasons, each type of exemption is covered narrowly with particularity. Strikes are an excuse for delayed delivery and not for the disappearance of goods, and, consequently, delayed delivery merely postpones the time for delivery and any consequences proximately caused by delay without fault of the carrier.
*434 Thus, restrictions on the normal rule for determining the amount of damages are easily summarized. The carrier may not limit damages to an amount less than $500 per package; and, on the other hand, it may not be required to pay more than the damage actually sustained. Since there were 200 “ sacks ” of cloves lost, the carrier must pay “actual damages ” in accordance with the normal rule up to $100,000. Since the value of the cloves was at all times within the $100,000 statutory limit, damages are determined by the general rule stated and repeated above.
In this instance, the carrier made no attempt to change the normal measure of the amount of damages. Whether a provision in the bill of lading fixing damages when the vessel arrived, regardless of when the goods should have been delivered, would be enforceable need not be determined. No such provision was included.
In summary, the measure of damages is the market value of the cloves when the breach of duty occurred. Since the strike exemption clause excused the delay in delivery and since the loss was not disclosed and the importer was not informed of the loss until the strike was over, the amount of damages is the market value on that date.[3]
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. Plaintiff was the purchaser of an order bill of lading consigned to order with direction for notice of arrival to plaintiff in New York City.

. Notably, the provisions of the Carriage of Goods by Sea Act incorporated by reference in the bill of lading are controlling where they may conflict with other provisions of the bill of lading (cf. Cia de Navegocion Fruco, S. A. v. Horn, 233 F. Supp. 637, 642 [S. D. Ala.], mod. on other grounds 404 F. 2d 422, 429, cert. den. 394 U. S. 943).

. As for the suggestion that the court is awarding damages in the same amount as. if there were no strike clause, this is not so. If there had been no strike clause, the damages would have been fixed at time of the breach, probably the earlier December date. If the market had been higher then, and lower at time of the strike’s end, the damages would have been greater because of the absence of a strike clause. The effect of the clause on the facts of this case, however, was that the strike clause, by excusing delay and therefore extending the time to deliver, shifted the time of the breach, in this instance, to a time when the market was higher. Were the market lower at the later date the damages would be lessened by reason of the strike clause. Of course, the fluctuations of the market will determine the economic effect of any clause and that, it is submitted, is inescapable as it should be. Most cases will not involve market fluctuations and therefore the clause generally will serve only to reduce the damages for delay, and only upward fluctuations, as occurred in this case, might increase the damages. The strike clause was not intended to and should not be construed to insure the breaching carrier against loss from circumstances not caused by the strike.