**Edward E. LUCENTE, Plaintiff,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. 99 CIV. 3987(CM).**

United States District Court, S.D. New York.

May 1, 2001.

---

David Quittmeyer, David R. Quittmeyer, Douglas L. McCoy, George M. Walker, Hand and Arendall, L.L.C., Mobile, AL, for Plaintiff.

Peter T. Barbur, Cravath, Swaine & Moore, New York City, for Defendant.

## MEMORANDUM DECISION AND ORDER DISPOSING OF PLAINTIFF'S MOTION FOR RECONSIDERATION

McMAHON, District Judge.

In February 1999, plaintiff Edward Lucente sued IBM, seeking the value of certain restricted stock and stock options that he claimed had been wrongfully canceled subsequent to his departure from IBM after thirty years' loyal service. IBM advised Lucente that his stock and options were canceled when he took up employment with a company that IBM viewed as a competitor.

On April 7, 2000, Lucente moved for summary judgment as to liability, on the ground that the non-competition provisions pursuant to which IBM purported to act were not enforceable as against him, thus rendering its cancellation of the various stock and option awards wrongful. IBM opposed Lucente's motion and cross-moved for summary judgment of non-liability, as well as for partial summary judgment declaring the proper measure of damages if Lucente succeeded in proving liability.

In *Lucente v. International Business Machines Corp.*, 117 F.Supp.2d 336 (S.D.N.Y.2000) ("*Lucente I*"), this Court granted plaintiff's motion, and denied defendant's cross-motion, for summary judgment on the issue of liability. I held that the noncompetition clauses in the agree-

ments at issue were unreasonable as a matter of law, and that IBM had indeed breached its obligations to Lucente when it canceled his restricted stock and stock option awards pursuant to those unenforceable provisions. As to IBM's motion regarding the measure of damages, I granted it in part and denied it in part, declaring the method that would be used to compute damages for loss of both the stock and the options, but leaving the actual calculation of damages for a trial. Familiarity with *Lucente I* is presumed.

Plaintiff now asks the Court to reconsider its earlier ruling to the extent that I resolved the issue of how to measure damages, which presents a pure question of law. *See Lucente I*, 117 F.Supp.2d at 352 ("Although calculation of the amount of damages is a factual determination, the formula used in making that determination is a question of law."). As to my conclusion that the value of Lucente's restricted stock should be measured as of a reasonable period after November 10, 1993—the last possible date for Lucente to have received his shares out of escrow under the terms of the restricted stock plan as applied to retired IBM executives—Lucente argues that I misapprehended the import of the Second Circuit's decision in *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136 (2d Cir.1983), because Lucente did not know about an amendment to the restricted stock plan that had accelerated the release date of his shares. As to my conclusion that the value of his stock options should be measured using either

the so-called Black–Scholes or binomial models, with a measuring date of April 15, 1993 (which I found to be the date of IBM's breach), Lucente argues that the measuring date is wrong, since his claim is not for breach of contract, but for anticipatory breach of contract—something one would not have known from perusing the original motion papers.[1]

It is not hard to fathom why Lucente moves for reconsideration. IBM stock today—even with the recent glitch in the stock market—is worth far, far more than it was in November or December of 1993. And Lucente's stock options were under water when IBM purported to cancel them in April 15, 1993. So if the theory of recovery is breach of contract, rather than anticipatory breach of contract, and his damages for loss of the options were measured from April 1993, Lucente could expect to recover only about $330,000 for his options (using economic pricing models that assign some minuscule market value to options that are not in the money).

For the reasons stated below, I have considered all of Lucente's arguments on his motion to reconsider. I adhere to my original holding about the value of the restricted stock, but have expanded my reasoning in response to plaintiff's newly crafted arguments. His motion for reconsideration of my holding about how to measure damages for his stock options is granted and, on reconsideration, I adhere to my original ruling, subject to an election that Lucente must make within twenty (20) days following the issuance of this

---

1. The Complaint alleged that "IBM has breached its obligation under the Plans by notifying Lucente that IBM has canceled Lucente's Restricted Stock Awards and his unexpired stock options." (Compl.¶ 34). Plaintiff's expert, Vaught, while offering no opinion on when the breach occurred, made his damages calculations as though the breach occurred on April 15, 1993. (Vaught Dep. (Bur-

sor Decl. Ex. 34) at 63.) ("I am told that [April 15, 1993] is effectively when [IBM's obligations] were breached."). As a result, I stated in *Lucente I*, "The parties do not dispute that the date of breach was April 15, 1993, the date IBM canceled Lucent's restricted stock and stock options." 117 F.Supp.2d at 353.

opinion. As will be seen, I decline to give Lucente the $25 million windfall he seeks. He must live with the consequences of the decisions he made, and the actions he took or chose not to take, over the past seven years.

## DISCUSSION

 Reconsideration will generally be denied "unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995). Motions for reconsideration must be narrowly construed and the standard strictly applied "to discourage litigants from making repetitive arguments on issues that have been thoroughly considered by the court", "to ensure finality" and "to prevent the practice of a losing party examining a decision and then plugging the gaps of the lost motion with additional matters." *Range Road Music, Inc. v. Music Sales Corp.*, 90 F.Supp.2d 390, 391–92 (S.D.N.Y.2000) (citing *In Re Houbigant, Inc.*, 914 F.Supp. 997, 1001 (S.D.N.Y.1996)). There can be little doubt that Lucente examined my prior decision and tried as best he could to "plug the gaps." However, because Lucente did not originally move for summary judgment as to damages, and may have misapprehended the impact of IBM's cross-motion for a declaration about how to measure damages, I elect to respond to his motion on the merits.

### 1. *Restricted Stock*

In *Lucente I*, this Court held that IBM breached its contract with plaintiff insofar as his restricted stock awards were concerned, and that it did so by purporting to cancel those awards on April 15, 1993. Because the stock was restricted and plaintiff could not have sold it on April 15, 1993, I further concluded that plaintiff's damages should be measured from a reasonable period after the date when he would have received the shares in unrestricted (i.e., saleable) form. *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136 (2d Cir.1983). In *Lucente I*, I concluded that the last possible date he could have received those shares in saleable form, based on the undisputed evidence, was November 10, 1993. Plaintiff had argued, and continues to argue, that the measuring date should be January 3, 2000.

The reason for our difference of opinion is as follows: Under IBM's Variable Compensation and Long Term Performance Plans, and the Escrow and Deposit Agreements that Lucente signed, plaintiff's stock was due to become unrestricted "on the later of January 1, 2000 or the first working day after the Employee's retirement." (Barbur Aff. at Ex. H.) However, in 1993, IBM amended those plans so that restricted shares would be released to retired executives (a class that includes Lucente) one year after they left IBM. At the time the plans were amended, Lucente and a number of other IBM executives had been retired for more than one year. As to those executives, the plan amendment provided that the stock be released from escrow immediately. Letters notifying the retired executives of this change went out on an undetermined date between the time the policy became effective (September 28, 1993), and the date when the first retiree disposed of his (formerly) restricted stock on November 5, 1993. (Supp. Statement of Christopher M. James at 2.)

The letters went to all executives except one: Edward Lucente. IBM did not send Lucente a letter because it already had sent him a different letter—the letter cancelling his restricted stock award—six

months earlier. Lucente was aware in April 1993 that, as far as IBM was concerned, he no longer owned any restricted stock. But he did not know until after he filed this lawsuit that IBM had accelerated the date on which he could have sold his shares.

Because he never received such a notification letter (thanks to IBM's wrongful cancellation of his stock awards), Lucente, citing *Schultz*, contends that he is entitled to treat the plan as though it had never been amended, and to have this Court assume that his stock would have been released to him under the original terms of the Plan—i.e., on January 3, 2000. He is incorrect.

■ Damages for breach of contract are intended to place a party in the same position he would have occupied if the breach had never occurred. They are not designed to create windfall recoveries. *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir.1995) (noting that the general purpose of damages awards is to place the injured party in the position in which she would have been had the contract not been breached); *see also Brushton–Moira Cent. School Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261, 669 N.Y.S.2d 520, 692 N.E.2d 551 (1998) ("[d]amages are intended to return the parties to the point at which the breach arose."); *Goodstein Corp. v. City of New York*, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (1992) (holding that damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed).

■ Moreover, under the ancient and hoary rule, damages for breach of contract are measured as of the date of the breach. *See, e.g., Rodriguez v. Moore–McCormack Lines*, 32 N.Y.2d 425, 429, 345 N.Y.S.2d 993, 299 N.E.2d 243 (1973). In *Lucente I*, based on statements made by Lucente and his counsel, *see supra* n. 1, I found that date to be April 15, 1993, the date when IBM divested plaintiff of ownership in his previously-awarded stock. However, I declined to measure plaintiff's damages for the breach as of April 15, 1993, because the canceled shares were restricted and were neither saleable nor in plaintiff's possession on that date. Analogizing Lucente's claim to one for conversion—where the general rule that damages are measured on the date of the conversion is ameliorated in the case of an item of fluctuating value (like stock)—I ruled that damages should be measured from a reasonable period of time after plaintiff would have received his stock in alienable form had IBM not wrongfully canceled his shares. *Lucente I*, 117 F.Supp.2d at 356. That date—thanks to the Plan amendment described above—was changed from January 3, 2000 to the autumn of 1993.

Lucente does not dispute that IBM altered the terms of the plan in 1993 to provide for the early pay-out of restricted stock to retired executives. As a matter of law, this plan amendment changed every retired executive's contract with IBM concerning his restricted stock. Lucente also does not dispute that he fell into the group of retired executives who had been gone from the company for more than one year—the group that received its stock in the autumn of 1993 by virtue of the amendment. Thus, if IBM had not breached its contract with Lucente by purporting to cancel his restricted stock awards, Lucente would have received a notification letter in the fall of 1993 and would have received his stock within a reasonable period (days or at most weeks) thereafter. Measuring his damages as though the plan had not been amended would put him in a substantially *better*

position than he would have been had IBM not breached. Therefore, Lucente's cannot possibly be the correct measure of damages.

Nonetheless, Lucente contends that the "reasonable period" necessarily presumes a reasonable period after a plaintiff actually has notice of the wrong done to him, and argues that he did not have notice of the wrong on April 15, 1993—even though IBM advised Lucente that it had canceled his restricted stock awards and divested him of his rights in the shares on that day. Lucente (now) contends that IBM's purported cancellation of his restricted stock in April 1993 was not a breach of contract, but rather (at his election) an anticipatory breach of a contract that IBM was not scheduled to perform until January 3, 2000—the date when IBM was originally supposed to release the restricted stock from escrow. Plaintiff argues that this makes the plan amendment irrelevant unless he had notice of it.

Lucente's argument is clever, but is misguided in several ways.

First, Lucente relies on cases where plaintiffs pleaded claims in conversion. *See, e.g., Caballero v. Anselmo*, 759 F.Supp. 144 (S.D.N.Y.1991); *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136 (2d Cir.1983). This reliance is misplaced. Lucente did not plead a claim in conversion. If he had, it would have been time barred. N.Y. C.P.L.R. § 214(4) (three year statute of limitations for conversion claims). Instead, he alleged that IBM, by cancelling the shares of restricted stock he already owned as punishment for his going to work for Digital Equipment Corporation, breached the terms of the contracts pursuant to which those award had been made. The conversion cases cit-

ed in *Lucente I*, like *Schultz* and *Galigher*, are applicable only insofar as they offer an analogy for determining how to give Lucente the benefit of his bargain in the face of IBM's breach.[2]

Second, Lucente can hardly claim that he did not know until last year of the wrong IBM did to him. The April 15, 1993 letter from IBM to Lucente was very clear. It stated: "[T]he IBM stock options and restricted stock in your name *have been canceled.*" (Barbur Decl. at Ex. Y.) (emphasis added). Lucente admits that he received this letter. Therefore, he had notice of the cancellation done to him in the spring of 1993.

Third, this is not an instance of anticipatory breach (in contrast to the stock option situation, which I will address later). In cancelling Lucente's restricted stock, IBM did not renege on a promise to award him stock sometime in the future. Lucente's Escrow and Deposit Agreements all provided that "The Company *has awarded* to the Employee [a varying number of] shares of the Capital Stock of the Company under Section 7(c) of the IBM 1989 Long–Term Performance Plan (the "Plan")." (Barbur Decl. at Ex. G.)(emphasis added). So from the time the award was made, Lucente owned shares of IBM. That those shares were to be deposited with and held in escrow by IBM during the time that the relevant restrictions on alienability applied (which was January 1, 2000 under the original plan, and in the autumn of 1993 under the amended plan), does not transform the stock award into some sort of promise to award stock in the future. Thus, Lucente cannot rely on a theory of anticipatory breach in connection with his restricted stock awards.

---

**2.** Of course, it may be that Lucente's real claim is one for conversion. If so, he needed to bring this suit many years before he did.

However, IBM has not raised this as a defense, so the issue is merely theoretical.

If, however, this were a case upon which the doctrine of anticipatory repudiation could be relied, then the only change I would make to my analysis in *Lucente I* would be to fix the date of the breach as November 10, 1993, rather than April 15, 1993.

The only way the facts pleaded by Lucente (and subsequently borne out by discovery) could create an anticipatory breach would be if I viewed IBM's April 15, 1993 letter as a repudiation of IBM's contractual agreement to deliver the shares to Lucente out of escrow when they became alienable. Each of the Escrow and Deposit Agreements signed by Lucente when he received an award of restricted stock provided as follows: "The Restricted Stock shall be deposited with and held by the Company in escrow during the period of the restriction .... This period of restriction will end and the shares will be released and delivered to the Employee on the later of January 1, 2000 or the first working day after the Employee's retirement." (Barbur Aff. at Ex. H.) Of course, this is not what plaintiff pleaded—he pleaded that IBM breached his contract by canceling the share awards in April 1993 (Compl.¶ 34). But assuming, *arguendo*, that this is what Lucente meant to plead, he runs squarely up against the fact that IBM had the contractual right to accelerate the release date by waiving the restriction. Lucente had already consented to IBM's exercise of that right by signing the Escrow and Deposit Agreement, which said that the "Executive Compensation Committee of the Board of Directors, on its sole discretion, may waive the restric-

tion(s) on such shares." (Barbur Aff. at Ex. H.)[3] Signing that document was a condition of Lucente's receiving his restricted stock awards. He acknowledged this aspect of the plan and consented to it.

Thus, Lucente was bound by any change that IBM made in the terms of the plan in the restricted period, and his right to the release of shares under the Escrow and Deposit Agreement was entirely governed by, and subject to, IBM's determination on these matters from time to time. Once the Plan was amended, plaintiff's contractual right was to obtain his shares out of escrow, not in January 2000, but no later than a few days after November 10, 1993—the last day on which any retired Plan participant received notice that the restriction had been lifted and the shares would be released from escrow upon submission of proper documentation. If IBM breached an obligation to deliver restricted stock pursuant to the terms of a contract (which I again note is not what plaintiff pleaded), then it necessarily breached that obligation by failing to deliver the stock in the autumn of 1993.

Lucente argues that IBM's failure to notify him about the amendment brings him within the rule of *Caballero v. Anselmo*, 759 F.Supp. 144 (S.D.N.Y.1991) and *Flickinger v. Harold C. Brown & Co., Inc.*, 789 F.Supp. 616 (W.D.N.Y.1992). Again, he is incorrect.

In *Caballero* (a conversion case, not a breach of contract case), the Court concluded that damages could be measured only from the time plaintiff was fully informed and aware of the status of her

---

**3.** Lucente signed the Escrow and Deposit Agreement pursuant to the terms of the IBM Variable Compensation Plan, which also said that "the Board may, from time to time, amend or suspend this plan for any purpose permitted by law, or discontinue it, provided that no amendment shall be made (a) with-

drawing administration of the Plan from the Committee; (b) permitting any member of the Committee to participate in the Plan; or (c) materially amending the eligibility and fund computation provisions." (Barbur Aff. at Ex. B.)

stock. The Court held that damages for conversion of stock belonging to a person who was a minor at the time of conversion, were measured by the highest value of the stock within a reasonable time after the child reached the age of majority—even though it was thirteen years after the act of conversion. *Id.* at 152–53. Putting to one side the fact that the plaintiff in *Caballero* was proceeding under a completely different theory than Lucente is, *Caballero* rests on the preposition that a minor, who had no official agent or guardian, was not in the position of a fully informed adult at the time of the conversion—hardly a rule that applies here.

*Flickinger*, 789 F.Supp. at 620, is a breach of contract (and fraud) case, and thus a closer fit to this one, but is, in the end, no more helpful to plaintiff. In *Flickinger*, defendant failed to deliver shares in September 1983, but the plaintiff did not learn of the non-delivery until April 1988. The court held that plaintiff was entitled to recover the value of the stock at the time of non-delivery, or the highest value of the stock between the time plaintiff "became aware of the non-delivery," and a reasonable time thereafter, whichever value was greater. *Id.* The key difference between *Flickinger* and this case is that the plaintiff in Flickinger literally did not know that his stock had not been delivered. Lucente, by contrast, knew that his previously-awarded shares had been canceled from the time he received the April 1993 letter. He, unlike Flickinger, had notice of the wrong IBM was committing against him. What Lucente did not subsequently receive was notice that the plan had been amended, and that he could obtain his stock free of restriction earlier than he

thought. That is not the sort of notice dealt with in *Flickinger.*[4]

I remain convinced that the only proper way to give Lucente the benefit of his bargain—which means to put him in the place he would have occupied if IBM had not canceled his restricted stock awards—is to recognize and take into account the fact that the Plan was amended. If IBM had done him no wrong, Lucente would have received his stock seven and one half years ago. Therefore, it makes no sense, legally or logically, to measure his damages as though the Plan had not been amended. This Court declines to jump down that particular rabbit hole.

IBM argues that since Lucente would have received notice of the Plan amendment between September 28, 1993 and November 10, 1993, the Court should calculate damages by the date at which IBM stock was selling at its highest price within that period: November 2, at $50.875 per share. According to IBM, it would have been quite simple for a retiree in Lucente's position to dispose of 12,283 shares of (formerly) restricted IBM shares within a few minutes. Millions of shares of IBM stock were being traded every day at that time. There is, therefore, no factual dispute-only a dispute from speculation as to what plaintiff's actual trading history might have been.

However, it is entirely possible that Lucente would have been the last to have his shares released from escrow. I will operate under the assumption that Lucente was notified that the restrictions were lifted on the last possible date, November 10, 1993. I previously found, and I adhere to my finding, that Lucente was entitled to a reasonable period to assimilate that information, to consider his options, and to sell

---

**4.** If Lucente were correct that the wrong done him, under a theory of either anticipatory repudiation or conversion, did not happen until January 2000, then he brought suit prematurely in 1999. Of course, that was not Lucente's theory at all.

the shares. This court considers a reasonable period to be the time between November 10, 1993 and December 31, 1993, the close of the calendar (and, for most individuals, the tax) year. The stock price during that period hit its high on December 17, 1993. *See* Yahoo! Finance, *available at* http://chart.yahoo.com. (last visited April 30, 2001). On that day, IBM shares closed at $59.75 per share. Therefore, the fair value of Lucente's restricted stock was 12,283 shares times $59.75, or $733,909.25.

## 2. *Stock Options*

█ The stock options present a more complicated problem. As noted above, plaintiff now argues that IBM should be held liable to it for cancellation of his stock options under a theory of anticipatory repudiation.

Lucente was awarded the following stock options:

| Grant Date | Exercisable Shares | Price Per Share | Expiration Date |
| --- | --- | --- | --- |
| 5–24–83 | 4,377 | 114.00 | 5–23–93 |
| 5–24–83 | 877 | 114.00 | 5–23–93 |
| 5–22–84 | 4,634 | 108.00 | 5–21–94 |
| 5–22–84 | 925 | 108.00 | 5–21–94 |
| 5–28–85 | 6,516 | 130.82 | 5–27–95 |
| 5–28–85 | 764 | 130.82 | 5–27–95 |
| 5–27–86 | 6,456 | 144.69 | 5–26–96 |
| 5–27–86 | 691 | 144.69 | 2–29–96 |
| 5–26–87 | 5,606 | 159.50 | 5–25–97 |
| 5–26–87 | 626 | 159.50 | 2–29–96 |
| 11–24–87 | 5,978 | 118.75 | 11–23–97 |
| 5–31–88 | 23,042 | 110.56 | 5–30–98 |
| 5–31–88 | 904 | 110.56 | 2–29–96 |
| 5–30–89 | 22,755 | 108.63 | 5–29–99 |
| 5–30–89 | 920 | 108.63 | 5–29–99 |
| 1–30–90 | 25,461 | 96.69 | 1–29–00 |
| 1–30–90 | 1,034 | 96.69 | 1–29–00 |
| 1–29–91 | 14,371 | 124.56 | 1–28–01 |
| 1–29–91 | 802 | 124.56 | 1–28–01 |

(Barbur Decl. at Ex. D.)

While plaintiff admits that IBM notified him of its intention not to honor his options on April 15, 1993, he argues that his losses on the stock options should not be calculated as of that date. Unlike his restricted stock (shares of which ceased to belong to plaintiff when the awards were canceled), stock options constitute a promise to do something in the future—a promise to sell stock to an individual at a set price at a time selected by the option holder during a prescribed period. Each option has its own "strike price" and each one has its own option period—meaning that different options expire on different days. None of Lucente's options had to be exercised on April 15, 1993, and none of them was due to expire on that date. Under their terms, plaintiff was free to exercise them at any time he wished, up to and including the expiration date for those options. Thus, plaintiff contends, it was for him, not IBM, to set the date for performance—and hence the date of the breach.

### The Governing Law

█ Lucente may have come to this argument belatedly—he certainly failed to highlight it in the papers filed in support of his motion for summary judgment—but as a matter of law he is correct. In cases of repudiation prior to the date due for performance, the plaintiff may elect to have damages determined as of the date when the contract should have been performed, and not as of the date of repudiation. *In Re New York, New Haven and Hartford R.R. Co.*, 298 F.2d 761, 764 (2d Cir.1962) ("[U]nder the law of contracts, even though a breach precedes the time for performance, damages for the breach are to be measured as of the time when the party in default should have performed.")

█ Generally, the rights of a party to a bilateral contract upon an anticipatory repudiation by the other are: (1) to rescind the contract altogether, and if any performance has been rendered by the injured party, to recover its value on principles of quasi contract; (2) to elect to treat the repudiation as a breach, either by bringing suit promptly or by making some

change of position; or (3) to await the time for performance of the contract and bring suit after that time has arrived. Samuel Williston, *A Treatise on the Law of Contracts* § 1337 (3d ed.1968) [hereinafter "Williston on Contracts"]; *Hochster v. De La Tour*, 2 E & B 678, 118 Eng. Rep. 922 (Q.B.1853); *Rachmani Corp. v. 9 East 96th St. Apt. Corp.*, 211 A.D.2d 262, 629 N.Y.S.2d 382 (1st Dep't 1995). This repudiation principle has been held to apply in option contracts. *See, e.g., Saewitz v. Epstein*, 6 F.Supp.2d 151 (N.D.N.Y.1998); *Hermanowski v. Acton Corp.*, 580 F.Supp. 140 (E.D.N.Y.1983), *aff'd in relevant part*, 729 F.2d 921 (2d Cir.1984).

■■■ Of course, where stock options are concerned, the issue of time for performance is trickier than in the ordinary commercial contract (e.g. "I will sell you 100 bushels of wheat at $10/bushel on August 15"). The holder of the stock option, unlike most promisees under contracts, has sole power to decide when (or if) the optionor must perform. He does so by tendering consideration and demanding performance on the date of this choice during the option period. *See, e.g., Hermanowski* 580 F.Supp. at 143 (holding that an option contract binds defendant to perform at the election of the plaintiff who is free to make his election has he sees fit); *In Re Riodizio, Inc.*, 204 B.R. 417, 422 (Bankr. S.D.N.Y.1997) ("An option contract is essentially an enforceable promise not to revoke an offer ... the optionor must keep the option open."). The only constraint is that the optionee must take some action to demand performance before the option expires. Once the contractual period for performance is over, nothing the optionee

does will revive the option. *Kaplan v. Lippman*, 75 N.Y.2d 320, 324–25, 552 N.Y.S.2d 903, 905, 552 N.E.2d 151 (1990) ("[W]hile the optionor cannot act in derogation of the terms of the option agreement, the optionee is not bound until the option is actually exercised").

### Lucente's Argument and the Rule of Hermanowski

■■■ Lucente argues that he had the right to elect to treat the stock options contracts as breached in April 1993 or to treat the 1993 letter as an anticipatory repudiation and abide the time when performance was due—which, in this case, was whatever date within the options period that *he* selected for exercise. As far as that goes, he is absolutely correct. But while this court recognizes Lucente's ability to hold IBM liable under a theory of anticipatory breach,[5] plaintiff still must take some action to establish the actual date of the breach. Therein lies Lucente's problem.

Both parties agree that *Hermanowski v. Acton Corp.*, 580 F.Supp. 140 (E.D.N.Y.), *aff'd in relevant part*, 729 F.2d 921 (2d Cir.1984), is a controlling case here, so a brief exposition of its facts is warranted. In *Hermanowski*, plaintiff resigned from his position as a director and officer of defendant's corporation on April 11, 1975, in exchange for $25,000 and a five year non-qualified stock option to purchase 50,-000 shares of defendant's common stock at $2/share. *Id.* at 141. Eight months later, defendant mailed plaintiff two copies of a non-qualified stock option certificate, dated April 12, 1975 (but sent on December 12, 1975), that included a cancellation provi-

---

**5.** Technically speaking, there is no cause of action for "anticipatory breach of contract." There is only a claim for breach of contract. However, in cases of "anticipatory repudiation (breach)," the promisee gets to choose whether the breach occurs at the time of the anticipatory repudiation, or at the time for performance. *See* Williston on Contracts § 1337.

sion. That provision allowed defendant to terminate plaintiff's option rights when employment ended "or at any time within one year by a notice of termination or on 30 days' notice after the expiration of one year." *Id.* at 141.

Plaintiff executed the certificate, and above his signature typed in the following: "with the proviso that said option is non-cancellable." *Id.* Plaintiff received no response until June 16, 1976, when defendant informed him that defendant regarded his stock option as cancellable. A week later, by letter dated June 23, 1976, defendant informed plaintiff that his option would terminate upon expiration of 30 days. *Id.* Plaintiff wrote letters to defendant rejecting the view that the options were cancellable. He received no response.

On September 28, 1979, well before the exercise period was due to expire, plaintiff attempted to exercise his option in part (i.e. he tendered for some but not all of the shares covered by the option). In accordance with the terms of the option contract, he forwarded to defendant a blank check for $10,000 and requested delivery of 5,000 shares of defendant's common stock. Six weeks later, by letter dated November 9, 1979, defendant returned the check, writing: "After searching the records of this corporation, it has been determined that you have no exercisable stock option." *Id.* Plaintiff sued for breach of contract soon thereafter. He sought damages for all 50,000 shares that had been covered by the option, even though he had only exercised as to 10% of that amount.

Defendant argued that the breach occurred either in December 1975, when the certificate containing the notice of cancelability was sent to plaintiff, or, at the latest, in June 1976, when defendant notified plaintiff that the option was canceled. *Id.*

Plaintiff contended that the June 1976 letters cancelling the option constituted an anticipatory repudiation of the agreement, and asserted that the agreement was actually breached on November 12, 1979, when defendant rejected plaintiff's exercise of options for 5,000 shares and rejected the check for $10,000. *Id.*

The court held that the breach took place on November 12, 1979, when plaintiff attempted to exercise some of his options. Judge Glasser agreed with plaintiff that, when defendant repudiated its obligations under the terms of the agreement in advance of the time for performance, plaintiff had several possible responses. "He could have considered the contract breached and claimed damage, he could have insisted that the defendant perform or urge it to retract its repudiation or he could have ignored the repudiation and awaited the time for performance." *Id.* at 142–143. The court noted that "[t]o recognize June 16 or June 23 [, 1976] as the date of breach as the defendant urges would permit the defendant to select the date of breach and thus rob the plaintiff of the value of his option, which ... is the right to speculate which it gives the option holder." *Id.* at 143. The court held that Hermanowski retained the right to exercise his options until the exercise period expired. It fixed the date of the breach as the date when plaintiff had formally demanded performance by exercising the option—November 12, 1979.

Moreover, Judge Glasser found that November 12, 1979 was the date of breach, not only as to the 5,000 shares, but as to all 50,000 shares under the option contract[6] to which the plaintiff was entitled. *Id.* at 144. "There was no necessity for the plaintiff to demand the balance of the

---

**6.** In *Hermanowski,* there was only one stock option award. In the case at bar, IBM made nineteen separate stock option awards to Lucente over an eight year period.

shares which, under the circumstances, would have been a futile and meaningless gesture." *Id.* at 143 (citing *DeForest Radio Tel. And Tel. Co. v. Triangle Radio Supply Co.*, 243 N.Y. 283, 293, 153 N.E. 75 (1926)).

Plaintiff argues that, under the *Hermanowski* rule, he, not IBM, gets to set the date of the breach. He is correct. The fact that he alleged in his Complaint (Compl.¶ 34) that the sending of IBM's 1993 repudiation letter constituted a breach, misled me (and IBM as well) into concluding that Lucente had indeed chosen that as the date of the breach.

However, now that Lucente knows that he will recover only a small faction of the damages he seeks should April 15, 1993 be the date of the breach, he argues that this Court should treat IBM's letter as an anticipatory repudiation and fix a later date as the date of the actual breach. Of course, plaintiff is somewhat vague about when that date might be. In his papers, plaintiff argues that there is a question of fact about the amount of Lucente's stock option damages, because a jury must decide what Lucente would have done if IBM had kept his options open, as it was supposed to do. *See Commonwealth Assocs. v. Palomar Med. Technologies, Inc.*, 982 F.Supp. 205, 208 (S.D.N.Y.1997) (noting that, "in determining damages, we look to what probably would have occurred if Palomar had performed as required by the contract"). Lucente urges this Court to allow a jury to consider the following dates in order to measure damages: (1) the date when the stock options were granted; (2) the date of Lucente's retirement, March 1, 1991; (3) the date they expired; (4) a date when the market price of IBM stock was two and one-half times the strike price; (5) the

date Lucente filed suit, February 24, 1999; and (6) evidence of Lucente's intent and how other IBM executives handled their stock options. (Pl. Br. In Supp. of Mot to Reconsider at 19–23.)

IBM proffers three responses. First, it argues that *Hermanowski* does not apply because the IBM options were cancellable, which the option in *Hermanowski* was not. Second, IBM contends that the date the lawsuit was filed cannot be deemed the date of IBM's breach, because the filing of a lawsuit is not equivalent to the exercise of an option. Finally, IBM argues that *Hermanowski* is distinguishable from the case at bar because Lucente, unlike Hermanowski, never attempted to exercise his options, and never demanded delivery of his restricted stock.[7] IBM maintains that this Court was correct when it found in *Lucente I* that April 15, 1993 was the date of the breach.

*Conclusion: Lucente Has Elected to Treat the Contract as Breached as of April 15, 1993, and Not to Rely on the Doctrine of Anticipatory Repudiation*

I conclude that, by filing the instant lawsuit, Lucente elected to treat April 15, 1993 as the date of the breach, and not to proceed under a theory of anticipatory breach. Explaining how and why I reach this result requires examining the reasons why Lucente's other proffered dates cannot, as a matter of law, be the date of the breach.

Lucente suggests no reason why the value of his stock options should be measured as of either the day they were granted or the day he retired, and the Court can think of none. As the Court sees matters, there are only four possible dates for the breach:

---

7. After the oral argument in this case, Lucente did exercise his last unexpired stock option in accordance with the contract's

terms. *See infra* for a discussion of the effect of this exercise.

The first is April 15, 1993, the date on which IBM sent the letter cancelling the stock options. This is the date relied upon in Paragraph 34 of the Complaint. If this is indeed the date of the breach, plaintiff can recover for IBM's adjudicated breach of contract. Unfortunately, because the options were under water on that date, he recovers very little—just under $330,000.[8]

■■■■■ The second possibility is that a jury must determine the date on which plaintiff would have exercised his options (or some of them), but did not do so because it would have been futile under *Hermanowski*. I reject this as a matter of law. Where a plaintiff proceeds under a theory of anticipatory breach of contract in a case involving stock options, he must take some affirmative action to set the date of the breach. He cannot simply do nothing and ask a jury to infer when he *might* have done something. Just as the stock option differs from other contracts in that the optionee gets to decide when performance is due, so a plaintiff in a stock option case has different responsibilities than does a plaintiff in a standard contract case. The holder of an option can set the time for performance, but he must take affirmative steps to do so, or the option expires and he loses his rights under it. To ask a jury to speculate as to whether and when an option would have been exer-

cised is impermissible—especially where, as here, such speculation could resurrect options that long ago expired.

■■■■ Courts have consistently held that an optionee must exercise his option in order to have rights under the underlying contract. *See, e.g., Muirhead v. Freimann*, 270 Mich. 181, 258 N.W. 238 (1935) (denying plaintiff's suits for specific performance of an option to buy land where he had not tendered the price called for under the option contract by the closing date of the option). An option constitutes

> a continuing offer to sell which is irrevocable during the period specified therein. Until it is exercised it contains no elements of a sale. Such a contract is necessarily unilateral, since it binds the optionee to do nothing but grants him the right to accept the offer or not, as he may choose, within the time and manner specified.... It is incumbent upon the optionee to exercise his option in the manner provided in the contract and, unless such requirements are waived, his failure to do so, or his attempt to exercise it in another manner, is inoperative to form a binding contract for sale.

*Reynolds v. Maples*, 214 F.2d 395, 398 (5th Cir.1954); *Basler v. Warren*, 159 F.2d 41, 42 (10th Cir.1947) ("There is no contract of purchase, or any obligation to sell and convey, until the option is accepted and performed, or tender of performance by

---

**8.** In *Lucente I,* 117 F.Supp.2d at 354–55, this court considered two widely accepted and widely used finance models for valuing stock options: (1) the Black–Scholes pricing model or (2) the Binomial Pricing model. Both these models compute the value of an option based on six inputs: (1) the stock price of the underlying stock at the date of the valuation of the options; (2) the exercise price; (3) the time of expiration (4) the annual risk-free rate; (5) the annualized volatility of the underlying stock; and (6) the annual dividend yield of the underlying stock. *Id.* What both these models have in common is that the value of a stock option—even one that is

"under water"—is always positive until the date the option expires. This is true because, no matter how far "under water" the option is, in a open market, a price can be placed on the chance that the shares will rise above the strike price at some point prior to the expiration date. Applying the models to Lucente's option awards on April 15, 1993 yields only marginally different awards: (1) under a Black–Scholes valuation, $320,693; or (2) under the binomial pricing model, $329,953. *Id.* Applying the model more favorable to the plaintiff, under the binomial pricing model, Lucente would be entitled to $329,953.

the holder is made in proper time.") Unless the option contract agreement provides otherwise, or unless the parties manifestly regarded it differently, time is of the essence and strict compliance is required. *See id.* (citing *Waterman v. Banks,* 144 U.S. 394, 12 S.Ct. 646, 36 L.Ed. 479 (1892)). The strict compliance rule of options was developed because in an option transaction an optionor is bound while the optionee is free to accept or reject the option as he chooses. *Simons v. Young,* 93 Cal.App.3d 170, 155 Cal.Rptr. 460, 467 (1979). An optionee buys a right, and with that right the optionee has the burden "to make a sufficient tender or offer of performance and to make this to the [optionor] within the time named." *Bourdieu v. Baker,* 6 Cal.App.2d 150, 44 P.2d 587, 591 (1933).

 Courts insist on strict compliance with this rule, even though it may sometimes lead to a harsh result. In *Cummings v. Bullock,* 367 F.2d 182 (9th Cir. 1966), the Ninth Circuit refused to order specific performance of an option, after the option period thereafter lapsed. The court stated:

> The result may seem harsh, and the rules applied are technical. But the decisions cited make the reason clear. An option, given for consideration, binds the optionor, but it does not bind the optionee. He may, if he chooses, walk away from the deal. That is why the language of the option agreement is construed in favor of the optionor and why the courts require that the optionee comply strictly with whatever conditions the agreement imposes upon his right to exercise the option if he chooses to do so.

*Id.* at 186.

The "futility" rule of *Hermanowski* does not militate against this conclusion. In *Hermanowski,* as in this case, the plaintiff received a letter cancelling his option, and sent letters of protest that were ignored. Thus, Hermanowski had every reason to believe that exercising his option would be a futile act. Nonetheless, he attempted to exercise it, and the Court set the date of the breach as the date when plaintiff exercised and was rebuffed—i.e. when defendant Acton did not perform—rather than the date the letter of cancellation went out. Judge Glasser did not excuse Hermanowski altogether from the obligation to exercise. Rather, he ruled that the Acton Corporation's refusal to honor Hermanowski's partial exercise excused any further exercise under his contract futile.

 I do not read *Hermanowski* as creating a rule that futility will be presumed from a cancellation letter. Rather, it creates a rule that futility may be presumed from a demand for partial performance and refusal. Other courts have so held. *See, e.g., Scully v. Wats,* Civ. A. 97-4051, 1999 WL 391495 (E.D. Pa. June 8, 1999) (damages measured at time plaintiff attempted to exercise options but was repudiated by defendant); *Colorado Mgmt. Corp. v. American Founders Life Ins. Co.,* 148 Colo. 519, 367 P.2d 335, 337 (1961) (in an action for refusal to deliver shares per stock option agreement on a date when the share price exceeded the exercise price, affirming trial court holding that measure of damages was market price at time of refusal to deliver); *Finnell v. Bromberg,* 79 Nev. 211, 381 P.2d 221, 227 (1963) (in an action for breach of stock option agreement, damages measured on date optionee attempted to exercise his "in the money" options but was repudiated by grantor).[9]

 Because Lucente was required to exercise his options—or at least some of

9. Another case cited by both parties (despite the Ninth Circuit's admonition that the opin- ion was not for publication) reached the same result as *Hermanowski* on the virtually identi-

them [10]—to set the breach, this Court will not allow a jury to invent a hypothetical date on which plaintiff would have exercised his options, absent defendant's breach.

■ The third possibility is that the date of the breach was fixed on the date Lucente filed this lawsuit. That was the first time Lucente took any formal action to safeguard his rights.

Of course, if the Court were to accept Lucente's invitation to set the date of the breach as the date of the filing of this lawsuit, every option that had expired prior to the filing of the lawsuit would have to be treated as a nullity. The law is clear— once an option has expired, it cannot be revived. *Page v. Shainwald,* 169 N.Y. 246, 62 N.E. 356 (1901) ("Where an option has expired by failure to make a tender on a day specified, it cannot be enforced, in the absence of evidence of an agreement reviving it, or a new contract."). It is undisputed that Lucente did not exercise any of his options before filing suit. If February 24, 1999 is indeed the date of the breach, then plaintiff, by declining to take some affirmative step to protect himself before certain of his options expired (i.e., exercising the

options in a timely way), lost forever any recovery with respect to the options that expired unexercised on May 23, 1993, May 24, 1994, May 27, 1995, May 26, 1996, February 29, 1996, May 25, 1997, November 23, 1997, and May 30, 1998. It is not clear from the record why Lucente chose not to exercise any of his options prior to bringing suit, although his counsel admitted at oral argument that Lucente limited himself to writing letters for many years because (1) he hoped to settle with IBM, and (2) at IBM's mid-decade stock price, he did not find it worth his while to hire a lawyer. But whatever the reason, he acted at his peril.

As of the date the lawsuit was filed, plaintiff still had options with expiration dates of May 29, 1999, January 29, 2000, and January 28, 2001. (Decl. of Peter Barbur at Ex. D.) If bringing suit fixed the date of defendant's breach, Lucente's damages would be measured as the difference between the stock price of IBM on February 24, 1999 ($173.75) and the strike prices (May 29, 1999 ($108.63); January 29, 2000 ($96.69); and Jan. 28, 2001 ($124.56)), times the number of shares subject to

---

cal facts. *In Holm v. CalEnergy Co.,* 229 F.3d 1157, 2000 WL 975177 (9th Cir.2000), plaintiff had a non-qualified option to purchase Calenergy common stock. Calenergy sent Holm a letter on March 7, 1991 indicating that it would consider the number of shares covered by the option to stop increasing on March 31, 1991, despite the contractual provision stating that the shares covered by the option would increase until February 28, 1993. *Id.* The court treated the March 7 letter as an anticipatory repudiation, giving Holm the option of suing immediately or waiting to sue when the contract actually was breached. *Id.* at *2. Holm chose to wait, and on October 14, 1996, attempted to exercise his option to purchase the shares that were to have vested after March 31, 1991. The court treated the date of the attempted exercise as the date of breach. *Id.*

10. In *Hermanowski,* the plaintiff argued futility; but given the general rule that the optionee controls the date of performance, it seems to me that a plaintiff in Lucente's shoes would not be required to deem any given breach by IBM as a breach of all seventeen of his separate option contracts. Therefore, I do not read *Hermanowski* as compelling a finding of futility upon the first exercise of an option. There is no reason why an optionee might not continue to speculate on the economic value of his options following an optionor's refusal to perform after a partial exercise. Therefore, if plaintiff had taken the prudent step of tendering funds and demanding delivery from time to time, as it suited his economic interest, we could have multiple breaches of multiple contracts in this case.

those three unexpired options.[11]

However, IBM urges that the filing of a lawsuit cannot be used to fix the date of its breach, because filing a lawsuit is not equivalent to exercising an option. From IBM's perspective, the only way to fix the date for breach under a theory of anticipatory repudiation is to abide by the terms of the contract and to tender money to IBM. If IBM wrongfully failed to honor that exercise, then plaintiff would have a claim for breach of contract, with damages measured as of the date of IBM's refusal to perform.

 I agree with IBM. As discussed above, when a promisor repudiates a contract, the injured party faces a choice—he can treat the repudiation as breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties; or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time. *See (Silver Air v. Aeronautic Development Corp. Ltd.*, 656 F.Supp. 170 (S.D.N.Y.1987)) *However, a contract that is not treated as broken continues to exist for the benefit of both parties.* There is no specific time limit within which the non-repudiating party must elect his remedy, but if the non-repudiating party himself defaults on the contract before he elects to accept the breach, the other party has the right to act upon his default. *Id.; see also North Country Rocky Point, Inc. v. Lewyt–Patchogue Co.*, 60 A.D.2d 866, 401 N.Y.S.2d 258 (1978). Thus, if Lucente elected not to treat the contract as breached as of April 1993, then the contract was valid and subsisting, and Lucente had to exercise his right as optionee and select a date for performance by performing himself.

Under the option contracts, to which Lucente was a party, the optionee's performance is to be made by tendering a check. The 1989 Long–Term Performance Plan provides:

9. Stock Option Exercise. The price at which shares of Capital Stock may be purchased under a stock option shall be paid in full at the time of the exercise in cash or, if permitted by the Committee, by means of tendering Capital Stock or surrendering another Award, including Restricted Stock, valued at Fair Market Value on the date of exercise, or any combination thereof.

Assuming that Lucente elected not to treat the April 15, 1993 letter as a breach, but to wait until the time for performance arrived and then exercise his remedies for breach, *Silver Air,* 656 F.Supp. at 178, he had to pay cash or tender stock or another award. Only at that point would IBM be in a position to breach by refusing to perform. Under the 1989 Plan, filing a lawsuit is not the equivalent of performance, and this Court can find no precedent to suggest that it could be.

Again, the futility doctrine of *Hermanowski* does not come into play. True, IBM had ignored Lucente's pleas for justice, but Lucente never set up IBM to commit a breach the contract by tendering his own performance. Plaintiff appears to have outsmarted himself.

 A fourth possibility is that the date of the breach is January 23, 2001, when IBM refused to honor plaintiff's exercise of his only remaining unexpired option. Under *Hermanowski,* 580 F.Supp. at 142, the date of the breach is the date on which the defendant rejected plaintiff's

11. The number of shares may be impacted due to stock splits over the past decade. In any event, it appears that the amount due would be substantial.

exercise of this option to purchase the shares and returned the check. In the present case, that date was January 23, 2001. On January 16, 2001, Lucente tendered $1,889,948.88 ($124.56 per share) to purchase shares of IBM stock pursuant to an option granted to him in January 1991.[12]

 However, IBM validly protests that January 2001 could not be the date of the breach because it post-dated the commencement of this lawsuit by almost two years. IBM is correct. Under a theory of anticipatory repudiation, a plaintiff who elects to treat a repudiated contract as continuing cannot sue until the breach occurs. *See, e.g., Silver Air*, 656 F.Supp. 170 (S.D.N.Y.1987). Plaintiff had not tendered any options for redemption prior to filing suit. On that day, he had no cause of action for breach of contract under his now-proffered theory that the April 15, 1993 letter constituted an anticipatory repudiation.

But Lucente did sue in 1999. And by filing this lawsuit, rather than exercising his options, Lucente elected his remedy: he elected to treat the contract as breached when it was repudiated. No other conclusion is possible because *that is the only ripe claim Lucente had in February 1999.* Prior to the filing of the lawsuit, IBM had taken no other action with respect to Lucente's stock options, so no other action could constitute IBM's breach of contract. Plaintiff's fleeting notation in his complaint that, "IBM has breached, *or has expressed an unequivocal intent to breach*" (Compl. ¶ 3, emphasis added) does not change the fact that the only wrongful act IBM committed prior to the filing of the lawsuit was

sending the April 1993 letter. By suing on that act, plaintiff indicated his intention to treat the sending of that letter as the breach of contract—even though it could have been treated as an anticipatory repudiation of contract if plaintiff had acted differently.

Does the preceding discussion mean that Lucente's recent exercise of his one remaining option is a nullity?

Obviously, Lucente has not yet specifically pleaded a claim for breach of contract by IBM arising out of the company's failure to honor the recently-exercised option. And regardless of this Court's finding that IBM's purported cancellation of Lucente's stock and options was wrongful, his commencement of this lawsuit, which purports to state a claim for breach of ALL his options (including the recently exercised option), gives rise to an interesting—and not unpersuasive—argument that Lucente forfeited his right to exercise his then-remaining options when he brought his action for breach of contract.

 And so we come to the election of which I spoke at the outset of this decision. Lucente's existing complaint alleges, and could only allege, that IBM breached its contract with him in April 1993, by wrongfully repudiating and cancelling his stock options. If he pursues the claim he has already pleaded, Lucente knows what his damages will be, and the Court will enter judgment in accordance with this opinion.

However, if Lucente wishes to do so, he may have leave to amend his complaint, to assert a claim for breach of contract, on the assumption that he did not treat the 1993 repudiation as the breach, but instead

---

12. The options were not under water, despite the fact that IBM stock was trading at $109.06 on January 23 and the option contract had a strike price of $124.56. Since there were two intervening two-for-one stock splits since the options were awarded, the number of shares to which he was entitled was 60,692 (four times 15,173), and the strike price becomes $31.14 (one fourth of $124.56).

elected to treat it as an anticipatory repudiation, abide the time for performance, and sue. If he does so, he will be able to recover damages for the one stock option that was timely and properly exercised. Lucente has twenty (20) days from the date of this opinion to file an amended complaint. Should he do so, I will immediately schedule an inquest, unless the parties can try the damages case on stipulated facts.[13]

Unfortunately, Lucente cannot have it both ways. He cannot treat the contract as having been breached in 1993 as to those options that he never exercised, but merely as anticipatorily breached as to the options that were, finally, exercised. Unfair though it seem, Lucente must live with the consequences of his actions, and especially his inaction, over the past seven years.

This constitutes the decision and order of the Court

---

13. Obviously, Lucente's election will be without prejudice to his right to appeal from this decision and from *Lucente I* to the extent he is an aggrieved party.